# ALABAMA *v.* BOZEMAN

No. 00–492.   Argued April 17, 2001—Decided June 11, 2001

BREYER, J., delivered the opinion of the Court, Parts I, II–A, and II–C of which were unanimous, and Part II–B of which was joined by REHNQUIST, C. J., and STEVENS, O'CONNOR, KENNEDY, SOUTER, and GINSBURG, JJ.

*Sandra Jean Stewart,* Assistant Attorney General of Alabama, argued the cause for petitioner. With her on the briefs was *Bill Pryor,* Attorney General.

*Jeffrey A. Lamken* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Acting Solicitor General Underwood, Acting Assistant Attorney General Keeney,* and *Deputy Solicitor General Dreeben.*

*Mark John Christensen,* by appointment of the Court, 531 U. S. 1141, argued the cause and filed a brief for respondent.*

JUSTICE BREYER delivered the opinion of the Court.†

Forty-eight States, the Federal Government, and the District of Columbia (all of which, for simplicity, we shall call "States") have entered into the Interstate Agreement on Detainers (Agreement), 18 U. S. C. App. § 2, p. 692, an interstate compact. The Agreement creates uniform procedures for lodging and executing a detainer, *i. e.,* a legal order that requires a State in which an individual is currently imprisoned to hold that individual when he has finished serving his sentence so that he may be tried by a different State for a different crime.

The Agreement provides for expeditious delivery of the prisoner to the receiving State for trial prior to the termination of his sentence in the sending State. And it seeks to minimize the consequent interruption of the prisoner's ongoing prison term. In particular, Article IV(c) specifies that the receiving State shall begin the prisoner's "trial . . . within one hundred and twenty days of the arrival of the prisoner in the receiving State." At the same time, Article IV(e) prohibits return of the individual to the sending State before that trial is complete. It says:

---

*\*Mary E. Hunley* and *Alexander Taylor* filed a brief for the National Association of Extradition Officials as *amicus curiae* urging reversal.

†JUSTICE SCALIA and JUSTICE THOMAS join all but Part II–B of this opinion.

"If trial is not had on any indictment, information, or complaint contemplated hereby prior to the prisoner's being returned to the original place of imprisonment pursuant to article V(e) hereof, such indictment, information, or complaint *shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.*" (Emphasis added.)

The case before us requires us to interpret the Article IV language that we have just quoted. See *New York* v. *Hill,* 528 U. S. 110, 111 (2000) ("As 'a congressionally sanctioned interstate compact' within the Compact Clause of the United States Constitution, Art. I, § 10, cl. 3, the [Interstate Agreement on Detainers] is a federal law subject to federal construction") (quoting *Carchman* v. *Nash,* 473 U. S. 716, 719 (1985); *Cuyler* v. *Adams,* 449 U. S. 433, 442 (1981)). The case concerns a defendant whose initial imprisonment was interrupted briefly—for a single day—during which time he was brought to the receiving State for purposes of arraignment and then returned immediately to his original place of imprisonment. The question is whether, in such circumstances, the literal language of Article IV(e) bars any further criminal proceedings—because the defendant was "returned to the original place of imprisonment" before "trial" was "had." We conclude that Article IV(e) does bar further proceedings, despite the fact that the interruption of the initial imprisonment lasted for only one day.

## I

### A

The Council of State Governments drafted the language of the Agreement in 1956. See *United States* v. *Mauro,* 436 U. S. 340, 349–350 (1978). The United States joined in 1970. *Id.,* at 343. And Alabama is one of the 49 other current members. *Hill, supra,* at 111; Ala. Code § 15-9-81 (1995). The Agreement contains nine articles. Article I sets forth

the problems that led to the Agreement's creation, namely, that

> "charges outstanding against a prisoner, detainers based on untried indictments, informations, or complaints and difficulties in securing speedy trial of persons already incarcerated in other jurisdictions, produce uncertainties which obstruct programs of prisoner treatment and rehabilitation."

Article I then adds that "it is the . . . purpose of this agreement to encourage the expeditious and orderly disposition of such charges and determination of the proper status of . . . detainers . . . ."

Article II sets forth definitions. Article III gives a prisoner against whom a detainer has been lodged the right to "request" a "final disposition" of the relevant charges, in which case "he shall be brought to trial within one hundred and eighty days" (unless extended by the trial court for "good cause"); otherwise, the relevant "indictment, information, or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice." Art. III(a), (d).

Article IV gives "the jurisdiction in which an untried indictment, information, or complaint is pending," *i. e.*, the receiving State, the right "to have a prisoner against whom" it "has lodged a detainer . . . made available" for trial. Art. IV(a). It says further that, once the prisoner arrives in the receiving State, the "trial" must begin "within one hundred and twenty days" unless extended for "good cause." Art. IV(c). Article IV also sets forth the "antishuttling" provision at issue here. To repeat: that provision says that trial must be "had . . . prior to the prisoner's being returned to the original place of imprisonment"; otherwise, the charges "shall" be dismissed with prejudice. Art. IV(e). Article V sets forth conditions on the receiving State obtaining temporary custody of the prisoner. The remaining arti-

cles deal with subsidiary matters, not relevant here with one exception: Article IX provides that the "agreement shall be liberally construed so as to effectuate its purposes."

For present purposes, it is important to keep in mind that the Agreement basically (1) gives a prisoner the right to demand a trial within 180 days; and (2) gives a State the right to obtain a prisoner for purposes of trial, in which case the State (a) must try the prisoner within 120 days of his arrival, and (b) must not return the prisoner to his "original place of imprisonment" prior to that trial.

## B

In January 1997, respondent Michael Bozeman was serving a sentence of imprisonment for a federal drug crime in federal prison in Marianna, Florida. At the beginning of that month, the district attorney of Covington County, Alabama, who had earlier lodged a detainer against Bozeman in connection with charges related to discharging firearms, sought temporary custody in order to arraign Bozeman on those firearms charges and secure the appointment of counsel. On January 23, federal authorities released Bozeman to local officials. Those officials took him to Covington County, about 80 miles from the federal prison, where he arrived later in the day. Bozeman spent the night in the county jail, appeared in local court the next morning, obtained local appointed counsel, and was transported back to federal prison that evening. About one month later, Bozeman was brought back to Covington County for trial.

At that time, Bozeman's local counsel filed a motion to dismiss the state charges on the ground that in January Bozeman had been "returned to the original place of imprisonment" (namely, the federal prison) "prior to" "trial" on state charges being "had." See App. 37–42. Consequently, he argued, under Article IV(e) the state charges were without "any further force or effect," and the local court had to "enter an order dismissing the same with prejudice."

Bozeman was convicted, and the trial court subsequently denied Bozeman's motion for dismissal. It wrote that it "made much sense to bring" Bozeman "into the county briefly" to deal with "short pre-trial matters" and then to "return him to the surroundings to which he was accustomed." App. to Pet. for Cert. 28a. Doing so furthered Bozeman's "interest in maintaining . . . rehabilitation available to him in federal prison." *Ibid.* In the trial judge's view, Bozeman "certainly would not [have] receive[d] much rehabilitation in a county jail." *Ibid.* Consequently, the judge concluded, the January transfer was "wholly consistent with" the Agreement's goal, "to expedite the prosecution of state charges without interfering with any rehabilitative programs of the federal government." *Id.,* at 29a.

An intermediate State Court of Appeals affirmed the conviction. 738 So. 2d 934 (1998). But the Alabama State Supreme Court reversed by a 5-to-3 vote. 781 So. 2d 165 (2000). In its view, the literal language of the Agreement controlled and required dismissal of the state charges. The dissenters argued that the Agreement violation was merely "technical," and consequently did not require dismissal. *Id.,* at 170. The State petitioned for certiorari. In light of differences among the lower courts, we granted the writ. Compare, *e. g., United States* v. *Schrum,* 638 F. 2d 214, 215 (CA10 1981) *(per curiam)* (adopting District Court's literal interpretation of Agreement), with *United States* v. *Daniels,* 3 F. 3d 25, 27–28 (CA1 1993) (rejecting literal interpretation of Agreement). And we now affirm the Alabama Supreme Court's decision.

## II

Alabama does not deny a violation of Article IV(e) as *literally* interpreted, for it concedes that its officials "returned" Bozeman to his "original place of imprisonment," before Bozeman's county court "trial" was "had." Nor does Alabama claim that Bozeman waived the right to trial before return that Article IV provides. See Reply Brief for Peti-

tioner 1, n. 1. Cf. *Hill*, 528 U. S., at 114–115 (holding that defendant may waive his rights under Art. III of the Agreement). Rather, Alabama, supported by the United States Solicitor General and others, claims that Article IV(e)'s basic purpose is to prevent shuttling that would interrupt the prisoner's rehabilitation. See, *e. g.*, *United States* v. *Roy*, 830 F. 2d 628, 636 (CA7 1987) (provision is "meant to protect the prisoner against endless interruption of the rehabilitation programs because of criminal proceedings in other jurisdictions"). They say the one-day interruption that occurred here did not interrupt rehabilitation significantly. Hence, any violation is "technical," "harmless," or *"de minimis."* And Article IV(e) contains an implicit exception for such trivial violations. Brief for Petitioner 26; Brief for United States as *Amicus Curiae* 12–13. Cf. *Wisconsin Dept. of Revenue* v. *William Wrigley, Jr., Co.*, 505 U. S. 214, 231 (1992) (laws ordinarily are enacted with understanding that *de minimis* exceptions will be recognized). We cannot accept this argument, however, for two reasons.

## A

First, the language of the Agreement militates against an implicit exception, for it is absolute. It says that, when a prisoner is "returned" before trial, the indictment, information, or complaint *"shall not* be of any further force or effect, and the court *shall* enter an order dismissing the same with prejudice." Art. IV(e) (emphasis added). "The word 'shall' is ordinarily 'the language of command.'" *Anderson* v. *Yungkau*, 329 U. S. 482, 485 (1947) (quoting *Escoe* v. *Zerbst*, 295 U. S. 490, 493 (1935)).

The cases Alabama cites as supporting a "harmless error" construction involved statutes that lacked this absolute language. See, *e. g.*, *United States* v. *Montalvo-Murillo*, 495 U. S. 711, 716–717 (1990) (Bail Reform Act "is silent on the issue of a remedy for violations of its time limits"). Cf. *William Wrigley, Jr., supra*, at 231–232 (applying *"de*

*minimis* exception" presumption as "part of the established background of legal principles against which all enactments are adopted," where text did not provide a "contrary indication").

Moreover, the Agreement makes no distinction among different kinds of IV(c) "arrivals," say, by exempting those that are followed by return within a short, specified period of time, or those that are simply for the purpose of arraignment. Given the Agreement's language and the important consequences of starting the running of the 120-day time limit, we see no basis for such a distinction. Hence, we must assume that *every* prisoner arrival in the receiving State, whether followed by a very brief stay or a very long stay in the receiving State, triggers IV(e)'s "no return" requirement.

## B

Second, even were we to assume for argument's sake that the Agreement exempts violations that, viewed in terms of the Agreement's purposes, are *de minimis,* cf. Article IX (stating that Agreement "shall be liberally construed so as to effectuate its purposes"), we could not say that the violation at issue here qualifies as trivial. That is because the purpose of the "no return" provision cannot be as Alabama and the Solicitor General describe it, namely, as a simple, direct effort to prevent the interruption of rehabilitation. A provision that prevents *returning* a prisoner who has arrived in the receiving State does not directly *increase* the number of days the prisoner will spend in rehabilitation in the sending State. Rather, it directly and intentionally *decreases* the number of days that prisoner will spend in the sending State.

This point is obvious once one keeps in mind that the trial must take place within 120 days of the prisoner's arrival in the receiving State. Article IV(e)'s requirement that the prisoner remain in the county jail means that the prisoner will spend all of those 120 days away from the sending

State's rehabilitation programs. By contrast, returning the prisoner prior to trial—in violation of Article IV(e)—would permit the prisoner to participate in the sending State's program for some of those days. But to call such a violation "technical," because it means fewer days spent away from the sending State, is to call virtually *every* conceivable anti-shuttling violation "technical"—a circumstance which, like the 13th chime of the clock, shows that Alabama's conception of the provision's purpose is seriously flawed.

Article IV(e) may seek to remove obstructions to prisoner rehabilitation in a different way. The Agreement not only prevents "return," but it also requires the receiving State to pay for the prisoner's incarceration in that State during the period prior to trial. Art. V(h) ("From the time that a party State receives custody of a prisoner pursuant to this agreement until such prisoner is returned to the territory and custody of the sending State, the [receiving] State . . . shall be responsible for the prisoner and shall also pay all costs of transporting, caring for, keeping, and returning the prisoner"). That requirement may provide the receiving State with an incentive to shorten the pretrial period—to proceed to trial faster than 120 days or not to seek extensions—thus disposing of detainers, and the attendant "uncertainties which obstruct programs of prisoner treatment and rehabilitation," in the most "expeditious" manner. Art. I. See also *Cuyler*, 449 U. S., at 449 (discussing negative effects of detainers on prisoners). But if that is Article IV(e)'s purpose, the transfer here was inconsistent with it. By returning Bozeman to federal prison, the county saved itself the cost of housing him—and for a nontrivial several week period, which may have allowed it to delay resolving the detainer.

Alternatively, the Agreement's drafters may have thought that the "shuttling" itself, *i. e.*, the movement back and forth among prisons, adds to the *"uncertainties* which obstruct programs of prisoner treatment and rehabilitation." Art. I

(emphasis added). And they may have sought to minimize the number of "shuttles" for that reason alone.

Viewing the Agreement in terms of either purpose, we cannot say that the one-day violation here is *de mimimis*, technical, or harmless. Neither do the briefs (or, to our knowledge, any lower court opinion) point to any other plausible rehabilitation-related purpose of Article IV(e) specifically, in terms of which the violation here might count as trivial. But we need not decide precisely what led Congress and the many other legislatures to agree to Article IV(e)'s antishuttling remedy. Given the Agreement's absolute language, it is enough to explain why Alabama's view of the Agreement's purpose is not plausible and to point to other purposes more easily squared with Article IV(e)'s text and operation.

C

Alabama and *amici* make additional claims, basically elaborating on the trial court's view that return to the sending State after a brief journey to the receiving State for pretrial purposes is helpful, not harmful, to the prisoner. But given Article IV's text, which indicates a contrary view, the parties would more appropriately address these policy arguments to legislatures.

The Solicitor General also points to a federal statutory provision that says expressly that an "order of a court dismissing any indictment, information, or complaint may be with or without prejudice," depending on the "seriousness of the offense," the "facts and circumstances of the case," and the "impact of a reprosecution on the administration of the agreement" and "on the administration of justice." 18 U. S. C. App. § 9(1), p. 695. This statutory provision, however, governs only when "the United States is a receiving State." § 9. And here the United States is not the receiving State. We fail to see how this provision helps, rather than hurts, Alabama's cause. Although we reject Alabama's interpretation of the Agreement, our decision does not bar a

receiving State from returning a prisoner when it would be mutually advantageous and the prisoner accordingly waives his rights under Article IV(e).  Cf. *Hill*, 528 U. S., at 114–115 (holding that defendant may waive his rights under Art. III of the Agreement)

For these reasons, the judgment of the Alabama Supreme Court is affirmed.

*It is so ordered.*