STATE OF NEBRASKA, APPELLEE, V.
BILLY JACK REED, APPELLANT.
668 N.W.2d 245

Filed August 22, 2003.   No. S-02-839.

Robert P. Lindemeier, Lincoln County Public Defender, for appellant.

Jon Bruning, Attorney General, William L. Howland, and Lisa M. Hinrichsen, Senior Certified Law Student, for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

STEPHAN, J.

Billy Jack Reed appeals from an order of the district court for Lincoln County overruling his two motions to discharge. Reed contends that the court erred in interpreting specific provisions

of the interstate Agreement on Detainers (Agreement), codified at Neb. Rev. Stat. § 29-759 (Reissue 1995). We affirm.

## FACTS

On July 6, 2001, Reed was arrested in Illinois on charges of committing two murders in that state. He was initially held in Adams County, Illinois, awaiting trial. Various proceedings relating to the pending charges were held in Adams County beginning in July and continuing thereafter. On September 4, pursuant to an agreement of the State of Illinois and the defense, Reed was transferred from Adams County to the Illinois Department of Corrections facility at Menard, Illinois, to serve a custodial sentence for a parole violation. Thereafter, the State of Illinois would "writ" Reed from the Menard facility for his scheduled court appearances in Adams County, and then remand him back to the Menard facility following each appearance. This process continued until approximately the beginning of October 2001, at which time Reed remained in Adams County to face the pending charges. Reed has not been back to the Menard facility since that time.

On or about September 12, 2001, while he was incarcerated in the Menard facility, Reed was notified of a detainer filed against him by Lincoln County, Nebraska, on pending charges of first degree murder and use of a firearm to commit a felony. Pursuant to the Agreement, Reed subsequently delivered his request for speedy disposition of the pending Nebraska charges to the warden at the Menard facility. On October 31, the Lincoln County Court in Nebraska acknowledged receipt of the request.

Reed's request for speedy disposition, prepared pursuant to the requirements of the Agreement, included a certificate of inmate status completed by the warden of the Menard facility indicating that Reed was not eligible for parole from that facility until July 2002 and that a detainer had also been lodged against him by Adams County, Illinois. Also pursuant to the Agreement, the request included the warden's offer to deliver temporary custody of Reed to Lincoln County officials in order that prosecution of the Nebraska charges could commence.

After Reed submitted his request for speedy disposition of the Nebraska charges, but before it was received by Nebraska

authorities, Reed was removed from the Menard facility and returned to Adams County, Illinois, to await trial of the charges pending there. On October 25, 2001, the Lincoln County Attorney wrote letters to the Menard facility and to the Illinois prosecutor stating his understanding that Adams County was unwilling to allow Reed to be transferred to Nebraska pursuant to the detainer until resolution of the pending charges in Adams County. The Lincoln County Attorney nevertheless returned the necessary forms required by the Agreement to the Menard facility. The county attorney agreed to accept temporary custody of Reed, but specifically noted:

> Inmate Billy J. Reed is currently facing charges of two (2) counts of First Degree Murder in Adams County, Illinois. State's attorney, Barney Bier, who is prosecuting . . . Reed stated he would not release him to the State of Nebraska, Lincoln County, until the disposition of the Adams County, Illinois case. We will accept custody of . . . Reed as soon as he is available to the State of Nebraska, Lincoln County.

On February 14, 2002, Reed appeared for a status hearing in Adams County. At this hearing, the prosecutor outlined a plea agreement which had been negotiated. Under the agreement, Reed would plead guilty in Adams County to one count of first degree murder and one count of arson, and the sentence for his crimes would be no more than 50 years' incarceration. The plea was further predicated upon Reed's being charged with and pleading guilty to "second degree aiding and abetting in Nebraska, as well as robbery." Under the proposed agreement, the Illinois and Nebraska sentences were to be concurrent and sentencing in Illinois was to be delayed in order to permit Reed's transfer to Nebraska for disposition of his case here. Reed was to serve his sentence in Illinois. After discussion of the plea agreement during the status hearing, Reed entered guilty pleas to the two Illinois charges specified in the agreement. Sentencing was scheduled for March 25.

Reed subsequently waived extradition and was transported to Nebraska by the Lincoln County sheriff on March 7, 2002. On April 2, Reed was charged by information in Lincoln County with one count of first degree murder and one count of use of a firearm to commit a felony in connection with the death of Joyce

Boyer on or about July 3, 2001. At his arraignment, Reed entered pleas of not guilty, and a jury trial was scheduled for July 16, 2002. In a letter to Reed's attorney dated April 30, 2002, the Lincoln County Attorney offered to amend the charges against Reed to aiding and abetting second degree murder and aiding and abetting robbery in exchange for a plea of guilty. On June 5, with Lincoln County's permission, Illinois officials transported Reed from Nebraska to Adams County, Illinois, to enable him to attend the previously scheduled sentencing hearing, which had apparently been postponed. Reed's Nebraska attorney objected to this transfer on grounds that it "makes communication with his attorney difficult" and causes an "undue hardship on him in trying to prepare for trial."

During the Adams County hearing on June 7, 2002, Reed informed the Illinois court that he had received an offer from Nebraska consistent with the negotiated plea agreement and wished to proceed with the agreement. He requested that he be returned to Nebraska, and the Illinois court authorized such return and set the Illinois sentencing for August 21. Reed was returned to Nebraska on June 13.

On June 19, 2002, Reed filed two separate motions to discharge the Lincoln County charges, both based upon alleged violations of the Agreement. One motion alleged that Nebraska failed to bring him to trial within the 180-day period mandated by the Agreement, and the other alleged that his return to Illinois for the sentencing hearing violated the antishuttling provisions of the Agreement. After conducting an evidentiary hearing, the district court entered an order denying both motions. The court held that Reed was " 'unable to stand trial' " in Nebraska within the meaning of the Agreement during the period he was facing charges in Adams County, thereby tolling the 180-day period to bring Reed to trial in Nebraska. See § 29-759, art. VI(a). The court further found that Reed's return to Illinois for the sentencing hearing did not violate the antishuttling provisions of the Agreement, as Reed was never returned to the Menard facility, his place of original imprisonment. Reed filed this timely appeal, which we removed to our docket on our own motion pursuant to our authority to regulate the caseloads of the appellate courts of this state. See Neb. Rev. Stat. § 24-1106(3) (Reissue 1995).

## ASSIGNMENTS OF ERROR

Reed assigns, restated, that the district court erred in (1) finding the time to bring him to trial was tolled while he was facing pending charges in Illinois, (2) not finding that Nebraska failed to accept temporary custody of him, and (3) finding that the antishuttling provisions of the Agreement were not violated by his return from Nebraska to Illinois.

## STANDARD OF REVIEW

■ In a ruling on a motion to dismiss with prejudice based on alleged violations of the Agreement, a trial court's pretrial factual findings regarding the application of provisions of the Agreement will not be disturbed on appeal unless clearly wrong. See *State v. Williams*, 253 Neb. 619, 573 N.W.2d 106 (1997).

■ Interpretation of a statute presents a question of law, in connection with which an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below. *State v. Mather*, 264 Neb. 182, 646 N.W.2d 605 (2002); *State v. Pruett*, 263 Neb. 99, 638 N.W.2d 809 (2002).

## ANALYSIS

### BACKGROUND

■ In order to avoid prolonged interference with rehabilitation programs, the Agreement provides the procedure whereby persons who are imprisoned in one state or by the United States, and who are also charged with crimes in another state or by the United States, can be tried expeditiously for the pending charges while they are serving their current sentences. § 29-759, art. I; *Williams, supra.* Because the Agreement is a congressionally sanctioned interstate compact, it is a federal law subject to federal construction. *Cuyler v. Adams*, 449 U.S. 433, 101 S. Ct. 703, 66 L. Ed. 2d 641 (1981); *Williams, supra.* U.S. Supreme Court interpretations of the Agreement are thus binding on state courts. *Williams, supra.*

■ Although the Agreement does not define detainer, we have noted that a detainer is "a notification filed with the institution in which an individual is serving a sentence, advising the prisoner that he is wanted to face criminal charges pending in another jurisdiction." *Williams*, 253 Neb. at 626, 573 N.W.2d at

111. Accord *State v. Reynolds*, 218 Neb. 753, 359 N.W.2d 93 (1984). Because a detainer remains lodged against a prisoner without any action being taken on it, the Agreement sets forth two procedures designed to effectuate its purpose of expeditious prosecution. *Reynolds, supra.* The machinery of the Agreement may be activated by either the prisoner or the receiving state. *Reynolds, supra.*

Article III of the Agreement prescribes the procedure by which a prisoner against whom a detainer has been lodged may demand a speedy disposition of outstanding charges. *Reynolds, supra.* Specifically, article III(a) provides:

> Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party state, and whenever during the continuance of the term of imprisonment there is pending in any other party state any untried indictment, information or complaint on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within one hundred eighty days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information or complaint . . . . The request of the prisoner shall be accompanied by a certificate of the appropriate official having custody of the prisoner, stating the term of commitment under which the prisoner is being held, the time already served, the time remaining to be served on the sentence, the amount of good time earned, the time of parole eligibility of the prisoner, and any decisions of the state parole agency relating to the prisoner.

Article III(c) requires the warden or official having custody of the prisoner to promptly inform the prisoner of the source and contents of any untried complaint and of his right to request its final disposition. See *Reynolds, supra.* Upon receipt of a proper request for disposition under article III, the receiving state must bring the prisoner to trial within 180 days. *Reynolds, supra.* Article III(d), commonly referred to as the "antishuttling provision" of the Agreement, provides that if trial is not had on any indictment or information prior to the return of the prisoner "to

the original place of imprisonment," such indictment or information shall be dismissed with prejudice.

Article IV of the Agreement sets forth the procedures by which the authorities in the state where the charges are pending, the receiving state, may initiate the process whereby a prisoner is returned to that state for trial. *Reynolds, supra.* Under article IV(a), the appropriate officer of the receiving state must present a written request for temporary custody to the appropriate authorities of the custodial or sending state. *Reynolds, supra.* The sending state may not act on the request for a 30-day period, during which time the governor of the sending state may disapprove the request either on his or her own motion or upon motion of the prisoner. § 29-759, art. IV(a). If the proceedings are triggered under article IV, trial in the receiving state must be commenced 120 days after the arrival of the prisoner in that state. § 29-759, art. IV(c).

Article V(a) provides that in response to a request made under either article III or IV, "the appropriate authority in a sending state shall offer to deliver temporary custody of such prisoner to the appropriate authority in the state where such indictment, information or complaint is pending." It further provides that if the request for final disposition is made by the prisoner under article III, then "the offer of temporary custody shall accompany the written notice provided for in Article III." § 29-759, art. V(a). If the appropriate authority refuses to accept temporary custody or if an action is not brought to trial within the time periods authorized by articles III and IV, then the action shall be dismissed with prejudice. § 29-759, art. V(c).

Article VI(a) provides:

> In determining the duration and expiration dates of the time periods provided in Articles III and IV of this Agreement, the running of said time periods shall be tolled *whenever and for as long as the prisoner is unable to stand trial,* as determined by the court having jurisdiction of the matter.

(Emphasis supplied.)

## Unable To Stand Trial

This case presents the unusual circumstance of a defendant whose incarceration status in the sending state alternated between

that of a pretrial detainee and that of a prisoner serving a custodial sentence. As noted, Reed was facing pending charges in Adams County, Illinois, prior to his incarceration at the Menard, Illinois, facility. The record indicates that Reed was moved back and forth between Adams County and the Menard facility by agreement of the parties during the early stages of the Adams County proceedings so that he could serve time on a sentence of imprisonment in the Menard facility. No sentence of imprisonment had been entered in Adams County. The Nebraska detainer was lodged against Reed while he was at the Menard facility.

If the detainer had been lodged against Reed while he was being held in Adams County, the Agreement would not apply, as it is not applicable to pretrial detainers. See, e.g., *U.S. v. Muniz*, 1 F.3d 1018 (10th Cir. 1993); *U.S. v. Bayless*, 940 F.2d 300 (8th Cir. 1991); *State v. Hargrove*, 273 Kan. 314, 45 P.3d 376 (2002); *State v. Smith*, 115 N.M. 749, 858 P.2d 416 (N.M. App. 1993); *People v Wilden*, 197 Mich. App. 533, 496 N.W.2d 801 (1992). The Agreement applies solely to persons who have entered upon a term of imprisonment and therefore does not include pretrial detainees. See, *Muniz, supra*; *Bayless, supra*; *Hargrove, supra*; *Smith, supra*; *Wilden, supra*. Pretrial detainees are not serving a sentence at the time the detainer is filed, and thus they have no vested interest in programs of treatment and rehabilitation available to prisoners who are serving sentences. Pretrial detainees are therefore not under the protection of the Agreement. See, *Muniz, supra*; *Bayless, supra*; *Hargrove, supra*; *Smith, supra*; *Wilden, supra*. However, because the Nebraska detainer was filed at a time that Reed happened to be lodged at the Menard facility where he was serving a sentence, the Agreement is applicable to this case.

In his first assignment of error, Reed contends that the district court erred in finding that the 180-day time period in which to try him in Nebraska did not expire because he was "unable to stand trial" in Nebraska while charges were pending against him in Adams County. In this respect, Reed does not challenge the factual findings of the district court, but merely its interpretation of the statutory language of the Agreement.

The parties agree that the 180-day period in which to bring Reed to trial in Nebraska began running on October 31, 2001, the

day on which both the Lincoln County Attorney and the Lincoln County Court had received notice of Reed's request for final disposition of the pending Nebraska charges. See *Fex v. Michigan*, 507 U.S. 43, 113 S. Ct. 1085, 122 L. Ed. 2d 406 (1993) (holding 180-day period in article III(a) of Agreement commences when request for final disposition is received by prosecutor and appropriate court of jurisdiction that lodged detainer). The issue presented is whether the 180-day time period was tolled while the Adams County charges remained pending.

Reed argues in his brief that he was not "unable to stand trial" in Nebraska because "Nebraska could have taken custody of him at any time to meet their [sic] responsibilities under the [Agreement]." Brief for appellant at 13. He argues that his request for final disposition of the Nebraska charges is deemed a waiver of extradition and a consent to the production of his person in Nebraska pursuant to article III(e). He further argues that the warden at the Menard facility offered to deliver temporary custody of Reed to Nebraska and that although the Lincoln County Attorney had complete authorization thereafter to seek custody, he failed to do so simply because the Adams County Attorney expressed a preference that the charges against Reed in Illinois proceed first. Reed contends that pursuant to article IV(a), only the governor of a sending state, in this case Illinois, can refuse a transfer of a prisoner once a request for temporary custody is made by a receiving State and that therefore, the wishes of the Adams County Attorney were completely immaterial and did not affect Nebraska's right under the Agreement to take custody of him.

Reed's reliance on article IV(a) is misplaced. As noted, article IV provisions are invoked in situations in which the receiving state initiates the process of proceeding on a lodged detainer. In this case, Reed initiated the process by filing a request for final disposition under article III. As required by the Agreement, his request included an offer of temporary custody made by the Menard facility. Although Nebraska *responded* to this offer of temporary custody pursuant to article III, Nebraska did not *initiate* a request for temporary custody under article IV. Therefore, the provisions of article IV are not applicable in this proceeding. Because the provision that only the governor of a sending state may deny a request for temporary custody is contained in article

IV, there is no merit to Reed's contention that the wishes of Adams County officials to keep him in Illinois to face pending charges could not render him "unable to stand trial" in Nebraska. Moreover, because article V(a) requires that at the time a request for final disposition is made by a prisoner, the sending state *shall* offer to deliver temporary custody to the receiving state, Reed's reliance on the fact that the Menard facility offered temporary custody is also without significance.

In support of his argument that the 180-day period was not tolled, Reed relies on *State v. Steele*, 261 Neb. 541, 624 N.W.2d 1 (2001), and *State v. Meyer*, 7 Neb. App. 963, 588 N.W.2d 200 (1998). We find these cases to be distinguishable. *Steele* does not address the "unable to stand trial" language of the Agreement. In *Steele*, the defendant was charged in Lancaster County on April 16, 1999, trial was set, and he was released on bond. Subsequently, Colorado filed a fugitive complaint against the defendant. On May 24, he waived extradition and was returned to Colorado. Nebraska authorities were aware of the extradition and took no steps to oppose it. The defendant subsequently brought a motion to discharge the Nebraska charges, alleging his statutory right to a speedy trial under Neb. Rev. Stat. § 29-1207 (Reissue 1995) had been violated. The State argued that the provisions of the Agreement were applicable and that under those provisions, the defendant's rights had not been violated.

We concluded that once Nebraska filed the information and charged the defendant with the crime in April 1999, his statutory speedy trial rights under § 29-1207 were invoked and the provisions of the Agreement were not applicable. We further held that the defendant's voluntary waiver of extradition did not prevent Nebraska from refusing to surrender him to Colorado when Nebraska charges remained pending. We therefore concluded that the time period during which the defendant was in Colorado was not excluded and that the defendant's right to a speedy trial was violated. *Steele* is factually distinguishable from the instant case and provides no guidance on the issue of interpreting the "unable to stand trial" language of the Agreement.

The only reported Nebraska appellate opinion interpreting the "unable to stand trial" language of the Agreement is *Meyer, supra.* In that case, the defendant was charged in Sarpy County on April

20, 1995, with burglary, theft by unlawful taking, and criminal mischief. At that time, the defendant was incarcerated in Iowa. On July 27, Sarpy County lodged a detainer against the defendant at the Iowa facility in which he was incarcerated. On March 24, 1997, the defendant filed an article III pro se notice of place of imprisonment and request for final disposition of the Sarpy County charges.

The very next day, the defendant was granted parole in Iowa and released to the custody of Sarpy County on the detainer. A preliminary hearing was set for April 10, 1997, and the defendant was released on bond. He failed to appear at the preliminary hearing because, unbeknownst to Sarpy County officials, he had been taken into custody in Iowa on new charges on March 28. The defendant was sentenced on the Iowa charges on October 15 and incarcerated in Oakdale, Iowa. The defendant remained incarcerated until February 3, 1998. On that date, he was then arrested by the Sarpy County sheriff and brought back to Nebraska for arraignment on the April 20, 1995, complaint. On April 8, 1998, the defendant filed a motion to dismiss the charges due to an alleged violation of the 180-day period in the Agreement.

The Nebraska Court of Appeals found that the 180-day period to bring the defendant to trial was triggered by his March 24, 1997, request for final disposition. Then, adopting the view of the majority of federal courts, it held that a defendant is "unable to stand trial" within the meaning of the Agreement during all those periods of delay occasioned by the defendant. *State v. Meyer*, 7 Neb. App. 963, 588 N.W.2d 200 (1998). The Court of Appeals determined that the defendant's reincarceration in Iowa was clearly a delay caused by him and that thus, the 180-day period was tolled either until he reappeared in Nebraska court or until he fully and completely advised Sarpy County of his exact whereabouts so that they could " 'go get him' " pursuant to his request for final disposition. *Id.* at 971, 588 N.W.2d at 205. The court reasoned that a contrary holding would allow a defendant to seek final disposition of pending charges and then disappear for 180 days and cause the charges to be dismissed.

Relying on *Meyer*, Reed argues that as long as Nebraska officials were aware of Reed's whereabouts in Adams County, they could "go get him" and that thus, the 180-day time period was

not tolled because he was not unable to stand trial. *Meyer*, however, did not address what effect pending charges in the other jurisdiction would have on the rule announced, as the defendant in that case was simply incarcerated and not facing new charges in Iowa. Therefore, *Meyer* is not instructive in this case.

Other state courts have addressed the "unable to stand trial" language of the Agreement in situations that are factually analogous to the instant case. In *Johnson v. Commissioner of Correction*, 60 Conn. App. 1, 758 A.2d 442 (2000), a prisoner filed a petition for a writ of habeas corpus in which he sought to quash a detainer lodged against him by Massachusetts. The detainer was lodged while the prisoner was serving a burglary sentence in Connecticut, and the prisoner requested final disposition of the charge on July 5, 1996. Pursuant to the provisions of article III of the Agreement, the prisoner's request included an offer by Connecticut authorities to deliver temporary custody of the prisoner to Massachusetts. This offer was received by Massachusetts authorities on August 8.

On August 16, 1996, however, while still incarcerated in Connecticut, the prisoner was charged with another Connecticut crime. Trial on this charge began on September 5, and the charge was finally resolved nearly a year later. In the meantime, however, on December 17, Massachusetts authorities had attempted to obtain temporary custody of the prisoner. Although it was not clear from the record, the district court found that it could be inferred that Massachusetts was denied custody at that time and that conversations between the respective prosecutors made it clear to Massachusetts officials that further efforts to obtain custody of the prisoner would not be fruitful until resolution of the new Connecticut charges. The court found that Connecticut's refusal to transfer the prisoner until the pending charges were resolved was justified and thus that while the prisoner was facing the pending charges in Connecticut, he was "unable to stand trial" in Massachusetts. It thus denied the prisoner's request for habeas relief.

In *State v. Cook*, 330 N.J. Super. 395, 750 A.2d 91 (2000), New Jersey lodged a detainer against a defendant incarcerated in Pennsylvania. On April 7, 1988, New Jersey requested temporary custody of the defendant. At that time, the defendant had been

sentenced on one of three Pennsylvania murder charges and was incarcerated pending disposition of the remaining charges. Pennsylvania authorities thus declined to offer temporary custody. On March 30, 1994, all proceedings in Pennsylvania concluded.

The defendant was finally transported to New Jersey on June 8, 1994, and filed a motion to dismiss the charges based on violation of the Agreement. The court held that the defendant was not entitled to a dismissal of the charges because "[o]utstanding charges pending in a sending state renders a defendant 'unable to stand trial' in the receiving state under the [Agreement]." *Cook*, 330 N.J. Super. at 413, 750 A.2d at 101.

In *People v. Whitely*, 143 Misc. 2d 83, 539 N.Y.S.2d 652 (1989), New York lodged a detainer against a defendant serving a 2-year prison term in Connecticut. The defendant was simultaneously facing four separate charges then pending in Connecticut. The court held that the defendant was unable to stand trial in New York during the proceedings on the pending Connecticut charges, reasoning that the Agreement was never intended to benefit one who still had outstanding charges against him in the sending state, and that pending proceedings in the sending state can therefore be the basis for a tolling of the 180-day requirement under article III.

In *State v. Binn*, 196 N.J. Super. 102, 481 A.2d 599 (1984), New Jersey filed a detainer against a prisoner incarcerated in New York. The prisoner requested speedy disposition of the New Jersey charges. New York, however, refused to offer temporary custody until pending charges in that state were resolved. The court rejected the prisoner's contention that "because New York was expeditiously moving other pending charges against him after he served his request for final disposition of the New Jersey charges that those New Jersey charges must be dismissed," finding that the Agreement "intended no such irrational result." *Binn*, 196 N.J. Super. at 108, 481 A.2d at 601-02. The court concluded that the prisoner was unable to stand trial in New Jersey because of the legitimate claim of New York to hold him to dispose of remaining New York charges.

■ We find these authorities persuasive. Moreover, we note that other courts have held that while a prisoner is in the custody of one jurisdiction facing charges which he requested be speedily resolved under the Agreement, he is unable to stand trial in

another jurisdiction in which he has also requested speedy resolution of pending charges. See, *United States v. Mason*, 372 F. Supp. 651 (N.D. Ohio 1973); *Vaden v. State*, 712 N.E.2d 522 (Ind. App. 1999); *State v. Maggard*, 16 Kan. App. 2d 743, 829 P.2d 591 (1992); *State v. Wood*, 241 N.W.2d 8 (Iowa 1976). These jurisdictions reason that a prisoner should not be able to manipulate the detainer process to his advantage and that his own actions in this regard make him unable to stand trial in both jurisdictions at the same time. *Id*. Although the instant case does not involve a simultaneous request for speedy disposition of charges in two jurisdictions, we find that the rationale articulated by these cases is applicable to the unique circumstances of this case. Thus, if one jurisdiction is actively prosecuting a defendant on current and pending charges, a defendant cannot be allowed to avoid pending charges in another jurisdiction simply by filing a request for final disposition under the Agreement, as clearly the defendant cannot stand trial in both jurisdictions at the same time. In such a situation, the defendant is unable to stand trial in the state in which he requested final disposition until resolution of the pending charges in the sending state.

Based upon the cases cited above, we conclude that the district court did not err in finding that Reed was unable to stand trial in Nebraska during the time period he was facing pending charges in Illinois.

### "REFUSAL" OF TEMPORARY CUSTODY

In his second assignment of error, Reed argues that Nebraska's "conditional" acceptance of temporary custody amounted to a refusal of or a failure to accept temporary custody under the Agreement. Notably, this argument was not presented in either of Reed's motions to discharge that were filed with the district court. This argument was also not raised during the evidentiary hearing held on the motions. When an issue is raised for the first time in an appellate court, it will be disregarded inasmuch as a lower court cannot commit error in resolving an issue never presented and submitted to it for disposition. *State v. Davlin*, 265 Neb. 386, 658 N.W.2d 1 (2003); *State v. Faber*, 264 Neb. 198, 647 N.W.2d 67 (2002). We therefore decline to address this assignment in this appeal.

## ANTISHUTTLING PROVISIONS

Reed asserts in his third assignment of error that the antishuttling provisions of the Agreement were violated in this case when he was transferred from Lincoln County, Nebraska, to Adams County, Illinois. In this respect, article III(d) provides in relevant part:

> If trial is not had on any indictment, information or complaint contemplated hereby prior to the return of the prisoner *to the original place of imprisonment,* such indictment, information or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.

(Emphasis supplied.) Similarly, article IV(e) provides:

> If trial is not had on any indictment, information or complaint contemplated hereby prior to the prisoner's being returned *to the original place of imprisonment pursuant to Article V(e) hereof,* such indictment, information or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.

(Emphasis supplied.) Article V(e) provides: "At the earliest practicable time consonant with the purposes of this agreement, the prisoner shall be returned to the sending state."

Reed argues that he was imprisoned in Illinois at the time he filed his request for speedy disposition and that he was transported back to Illinois on March 5, 2002, to attend the Illinois sentencing proceedings prior to trial on his Nebraska charges. He contends that such transport violates the antishuttling provisions of articles III and IV.

The district court found that "it could be argued" that by its "demand" on the State of Illinois and Reed's subsequent waiver of extradition, the State of Nebraska took steps under article IV to have Reed returned to Nebraska. Reed contends in his brief that Nebraska took such steps and that therefore, the provisions of both articles III and IV are applicable to this proceeding. However, the record reveals that all action taken under the Agreement was initiated by Reed. If article IV were invoked, Nebraska would have presented a written *request* for temporary custody to the appropriate Illinois authorities. See § 29-759, art. IV(a). No such request appears in the record. The only

correspondence with respect to the issue of temporary custody is Nebraska's *acceptance* of the Menard facility's offer of temporary custody that was made under article III. Therefore, only the antishuttling provisions of article III, and not the provisions of article IV, are applicable to our analysis of this issue.

Reed relies heavily upon *Alabama v. Bozeman*, 533 U.S. 146, 121 S. Ct. 2079, 150 L. Ed. 2d 188 (2001). In that case, the defendant was serving a sentence at a federal prison in Florida when Alabama lodged a detainer against him. Alabama then invoked the provisions of article IV and sought temporary custody of the defendant. Temporary custody was granted, and the defendant was released to Alabama officials. The officials transported him approximately 80 miles to Alabama, where he spent the night in county jail, appeared in court the next morning, and was then transported back to the federal prison in Florida. Approximately 1 month later, the defendant was returned to Alabama to stand trial.

The defendant filed a motion to dismiss the Alabama charges, arguing that the antishuttling provision of article IV had been violated by his return to the federal prison prior to trial in Alabama. Alabama did not contest that the Agreement was literally violated, but argued that the violation was de minimus because it did not prejudice the defendant or affect his rehabilitation program. The U.S. Supreme Court, however, found that the terms of article IV had been violated, and dismissed the Alabama charges. Reed contends that *Bozeman* stands for the proposition that the antishuttling provisions of the Agreement must be strictly construed in favor of the prisoner.

*Bozeman, supra*, however, did not address the factual situation present in the instant case, because in that case, the prisoner was clearly returned to the original institution in which he was serving a validly imposed custodial sentence and was not returned to the sending state for the purpose of facing pending charges. Moreover, *Bozeman* clearly interpreted and applied the antishuttling provision in article IV of the Agreement. As noted, the State of Nebraska never invoked the provision of article IV in this case, and thus the only antishuttling provision at issue in this case is that of article III(d). Although the provisions in each article are similar, they contain one striking difference. Article III(d) provides that the prisoner may not be returned to the "original place

of imprisonment," while article IV(e) provides that the prisoner may not be returned to the "original place of imprisonment *pursuant to Article V(e) hereof.*" (Emphasis supplied.) Article V(e) provides: "At the earliest practicable time consonant with the purposes of this agreement, the prisoner shall be returned to the sending state."

The difference in the statutory language of articles III(d) and IV(e) was addressed by the Supreme Court of Wyoming in *Merchant v. State*, 4 P.3d 184 (Wyo. 2000). In that case, a prisoner was serving a sentence in Canon City, Colorado, when he requested final disposition of outstanding Wyoming charges. He was subsequently transferred to Wyoming, based on this request. However, prior to being tried in Wyoming, the prisoner was returned to Weld County, Colorado, on two occasions to face pending charges. The prisoner was never returned to Canon City. He contended that the returns to Colorado violated the antishuttling provisions of the Agreement and required dismissal of the Wyoming charges.

The Wyoming Supreme Court found that it was the prisoner who requested final disposition of the Wyoming charges and that thus, the remedy for a violation of the antishuttling provision was found only in article III(d). The court noted the distinction between the language in articles III(d) and IV(e) and concluded:

> Absent modifying language in Article III, similar to that in Article IV, Article III's definition of "original place of imprisonment" is more precise and restrictive than that of Article IV. Article III requires that the prisoner be returned to his "original place of imprisonment," the Colorado Territorial Correction Facility in Canon City, Colorado, while under Article IV, it appears to suffice if the prisoner is returned to the sending state.

*Merchant*, 4 P.3d at 189. The court concluded that because the prisoner was never returned to Canon City, even though he was returned to another location in Colorado, the antishuttling provision of article III was not violated.

As Reed correctly notes, *Merchant* was decided prior to *Alabama v. Bozeman*, 533 U.S. 146, 121 S. Ct. 2079, 150 L. Ed. 2d 188 (2001). *Bozeman*, however, while holding that the provisions of article IV must be strictly applied, did not address the

statutory language of article III. Literally interpreting the statutory language of the Agreement, as we must under *Bozeman*, we conclude that there is a difference between the "original place of imprisonment" language in article III and the "original place of imprisonment pursuant to Article V(e) hereof" language in article IV. Under the article III "original place of imprisonment" language, it is not enough that a prisoner is returned to the sending state simply to face pending charges. In the instant case, we deem it particularly significant that Reed was never returned to *any* facility in Illinois in order to serve a term of imprisonment, but, rather, was returned to Illinois only to face pending charges. He was therefore never returned to his "original place of imprisonment," and the district court did not err in concluding that the anti-shuttling provisions of the Agreement were not violated.

## CONCLUSION

The district court properly determined that the 180-day period in which to bring Reed to trial under article III of the Agreement was tolled during the time Reed was in Adams County, Illinois, facing pending charges, as he was at that time "unable to stand trial" in Nebraska. Reed's contention that Nebraska failed to accept temporary custody is not properly before us in this appeal. Because Reed was never returned to Illinois to serve a sentence of imprisonment, the antishuttling provision of article III of the Agreement was not violated. The judgment of the district court is affirmed.

AFFIRMED.