# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs September 7, 2011

## STATE OF TENNESSEE v. MICHAEL SHANE SPRINGER

**Direct Appeal from the Circuit Court for Gibson County**
**No. 17764     Clayburn Peeples, Judge**

---

**No. W2010-02153-CCA-R3-CD  - Filed February 16, 2012**

---

THOMAS T. WOODALL, J., concurring in part and dissenting in part.

I agree with the portion of the lead opinion by Judge Bivins which holds that Defendant is not entitled to relief pursuant to Article III of the IAD.  I also agree and concur with the section of the lead opinion headed "*Other Arguments*."  I disagree with and therefore dissent from the remaining part of the lead opinion, which addresses Defendant's claim pursuant to Article IV of the IAD.

In *State v. Lock*, 839 S.W.2d 436 (Tenn. Crim. App. 1992), the State appealed from two trial courts' dismissals of charges against the defendant because of the State's failure to comply with the IAD.  Specifically, the State did not bring the defendant to trial within the statutorily set time limits.  The State contended on appeal that the defendant was not entitled to relief under the IAD because he had not been placed into the custody of Kentucky's state correctional agency after he was convicted in the "sending" state of Kentucky.  The defendant was in a county jail following his conviction in Kentucky and was not in a department of correction facility.  Rejecting a contrary ruling in *Crooker v. United States*, 814 F.2d 75 (1st Cir. 1987), this Court adopted the ruling of the Court in *Felix v. United States*, 508 A.2d 101 (D.C. Cir. 1986).

The District of Columbia Court of Appeals in *Felix* addressed the government's argument that the IAD did not apply to that defendant because, even though the defendant had been convicted and sentenced, the defendant was merely "for administrative reasons . . . incarcerated by the sending state in a temporary 'Transit Unit,' and . . . awaiting transfer to a permanent correctional institution."  *Id*. at 105.

Rejecting the government's argument, the court in *Felix* held,

In sum, once a person has been convicted, sentenced, and has begun serving that sentence in the sending jurisdiction, that person's status is distinguishable for purposes of invoking the Act's protections from that of a pretrial detainee. *See Dobson v. United States, supra*, 449 A.2d at 1085 (IAD becomes "pertinent" once an individual is "tried, convicted and sentenced"); *Bean v. United States*, 409 A.2d 1064, 1065 (D.C. 1979) (same). This is true even where the prisoner is awaiting transfer from one correctional facility to another.

*Id*. at 106.

Applying *Felix* to the case in *Lock*, this Court held, "We adopt the rule in *Felix*." "If a prisoner is under custodial authority by virtue of serving a term of imprisonment, the fact he is awaiting transfer from one facility to another is of no consequence to the operation of the [IAD]." *Lock*, 839 S.W.2d at 444.

Pertinent to the issue being addressed in the case *sub judice* is the language of Article IV(e) of the IAD, found in Tennessee Code Annotated section 40-31-101 and set forth herein in its entirety:

(e) If trial is not had on any indictment, information or complaint contemplated hereby prior to the prisoner's being returned to the original place of imprisonment pursuant to article V(e) hereof, such indictment, information or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.

Tenn. Code Ann. § 40-31-101 (2006 Repl.)

In *Lock*, this Court has thus previously held in May 1992, some fifteen years prior to when the Gibson County deputies returned Defendant to federal custody, that a prisoner's "place of imprisonment" was defined as where a *convicted* prisoner was being held in custody by the sending state *or* federal government, without regard to the particular designation of the physical structure (facility) wherein the custody is being imposed. As stated by this Court in *Lock*, "[t]he physical location of the prisoner should not control the [IAD's] application." *Lock*, 839 S.W.2d at 444.

Applying the law in Tennessee, as it is plainly set forth in *Lock*, produces a harsh result for the State, based upon a violation of the IAD which seems at first blush to be relatively minor. As set forth in the lead opinion, the Gibson County deputies obtained custody of Defendant on August 30, 2007, from the "sending state" (in this case the federal

government) where he was in custody, based upon federal convictions, at the federal detention facility in Mason, Tennessee, transported him to Gibson County Circuit Court for arraignment on the charges in the cases on appeal, and then returned him to the "sending state" (a/k/a the federal detention center) the same day without the Gibson County charges being resolved. A cursory review of a map of the State of Tennessee indicates the federal detention facility in Mason, Tennessee is approximately three counties away from Gibson County.

However, as made abundantly clear by the United States Supreme Court in *Alabama v. Bozeman*, 533 U.S. 146, 121 S. Ct. 2079 (2001), the harsh provisions of the IAD are to be applied because of the very mandatory language contained within the IAD. The factual scenario involved in *Bozeman* is set forth in the opinion:

> In January 1997, respondent Michael Bozeman was serving a sentence of imprisonment for a federal drug crime in federal prison in Marianna, Florida. At the beginning of that month, the district attorney of Covington County, Alabama, who had earlier lodged a detainer against Bozeman in connection with charges related to discharging firearms, sought temporary custody in order to arraign Bozeman on those firearms charges and secure the appointment of counsel. On January 23, federal authorities released Bozeman to local officials. Those officials took him to Covington County, about 80 miles from the federal prison, where he arrived later in the day. Bozeman spent the night in the county jail, appeared in local court the next morning, obtained local appointed counsel, and was transported back to federal prison that evening. About one month later, Bozeman was brought back to Covington County for trial.

> At that time, Bozeman's local counsel filed a motion to dismiss the state charges on the ground that in January Bozeman had been "returned to the original place of imprisonment" (namely, the federal prison) "prior to" "trial" on state charges being "had." See App. 37-42. Consequently, he argued, under Article IV(e) the state charges were without "any further force or effect," and the local court had to "enter an order dismissing the same with prejudice."

*Id*., 121 S. Ct. at 2083-84.

The state of Alabama, in the Supreme Court, admitted to a violation of Article IV(e) of the IAD as it is literally read, but asserted the one day "interruption" in service of his

sentence in the "sending state" was technical and harmless. *Id*. at 2084. The United States Supreme Court unanimously rejected this argument and held,

> First, the language of the Agreement militates against an implicit exception, for it is absolute. It says that, when a prisoner is "returned" before trial, the indictment, information, or complaint "*shall not* be of any further force or effect, and the court *shall* enter an order dismissing the same with prejudice." Art. IV(e) (emphasis added). "The word 'shall' is ordinarily 'the language of command.'" *Anderson v. Yungkau*, 329 U.S. 482, 485, 67 S.Ct. 428, 91 L.Ed. 436 (1947) (quoting *Escoe v. Zerbst*, 295 U.S. 490, 493, 55 S.Ct. 818, 79 L.Ed. 1566 (1935)).

> . . . .

> Moreover, the Agreement makes no distinction among different kinds of IV(c) "arrivals," say, by exempting those that are followed by return within a short, specified period of time, or those that are simply for the purpose of arraignment. Given the Agreement's language and the important consequences of starting the running of the 120-day time limit, we see no basis for such a distinction. Hence, we must assume that *every* prisoner arrival in the receiving State, whether followed by a very brief stay or a very long stay in the receiving State, triggers IV(e)'s "no return" requirement.

*Bozeman*, 121 S. Ct. at 2084-85.

The lead opinion relies upon *Jenkins v. United States*, 394 F.3d 407 (6th Cir. 2005) as authority to, in effect, overrule the holding in this Court's opinion in *Lock*. I do not agree that the holding in *Lock* is limited to only the speedy trial provisions of Article III of the IAD. We are obligated to follow binding precedent in published opinions, such as *Lock*. *See* Tenn. Sup. Ct. R. 4(G)(2)("opinions reported in the official reporter, however, shall be considered controlling authority for all purposes unless and until such opinion is reversed or modified by a court of competent jurisdiction."); *see also State v. Martha Patlan*, No. M2011-01175-CCA-RM-CD, 2011 WL 2848395, at \*10 (Tenn. Crim. App., July 18, 2011), *no perm. app. filed* ("Published precedent binds us . . . ."). None of the federal Circuit Courts of Appeal are a "court of competent jurisdiction" to overrule or modify the holding in *Lock*, even on a question of federal law. As regarding *federal* courts, our Court is under such circumstances bound to follow only the United States Supreme Court's rulings modifying or reversing this Court's prior decision. *See State v. McKay*, 680 S.W.2d 447, 450 (Tenn. 1984), *cert. denied*, 470 U.S. 1034 (1985); *State v. Green*, 995 S.W.2d 591, 600 (Tenn. Crim. App. 1998).

Of course, the Tennessee Supreme Court has the authority to overrule *Lock* if the issue is presented in a case accepted for review by that Court. Furthermore, the legislative branches of our governments (Congress and the Tennessee General Assembly) created and authorized the rules and procedures which lead to the results I conclude must be reached. The legislative branches of the respective governments could eliminate such harsh results previously imposed by them. However, this Court is currently without authority to do what our Supreme Court and the legislative branch can do. Accordingly, I conclude that the IAD, as previously interpreted requires a reversal of the judgments of the trial court and dismissal of the charges with prejudice, as mandated by legislative prerogative.

_____
THOMAS T. WOODALL, JUDGE