[Cite as *State v. Thomas*, 2013-Ohio-3411.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NO. CA2012-10-096 |
| | : | O P I N I O N |
| - vs - | | 8/5/2013 |
| | : | |
| WINSTON THOMAS, | : | |
| Defendant-Appellant. | : | |

CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 07CR24553

David P. Fornshell, Warren County Prosecuting Attorney, Michael Greer, 500 Justice Drive, Lebanon, Ohio 45036, for plaintiff-appellee

Clyde Bennett II, 119 East Court Street, Cincinnati, Ohio 45202, for defendant-appellant

**PIPER, J.**

{¶ 1} Defendant-appellant, Winston Thomas, appeals his convictions and sentence in the Warren County Court of Common Pleas for possession of and trafficking in marijuana.

{¶ 2} On October 9, 2007, Deputy Brian Lewis was patrolling northbound traffic on I-71 in Turtle Creek Township. Deputy Lewis noticed a dark-colored minivan traveling in the left-hand lane, followed by a semi-truck. Deputy Lewis clocked the van going 64 m.p.h. in an area of interstate that had a posted speed limit of 65 m.p.h. As the van and truck passed

Deputy Lewis, the van slowed so suddenly that the semi-truck had to apply its brakes to avoid a rear-end collision with the van. Deputy Lewis checked the van's speed, which had decreased to 59 m.p.h.

{¶ 3} After pulling onto the highway to follow, Deputy Lewis continued to watch the van, which had moved to the right lane. Deputy Lewis then saw the minivan drift over the centerline so that both the front and rear tires were across and into the left lane, only to drift back into the right lane. Deputy Lewis also observed the van's speed fluctuate from the mid-50s up to the mid-60s and back again. At that point, Deputy Lewis stopped the van.

{¶ 4} In addition to being a deputy with the Warren County Sheriff's Office, Deputy Lewis is also a trained canine handler, and at the time of the pertinent proceedings, was assigned to the Warren County Drug Task Force. Deputy Lewis informed Anthony Graham, the driver, that he pulled the van over because Graham committed a lane violation.[1] At that time, Deputy Lewis requested Graham's identification. Thomas, who was a passenger in the van, told Deputy Lewis that he had rented the van. Deputy Lewis requested Thomas' identification and the rental paperwork. While Deputy Lewis was waiting for Graham and Thomas to turn over their identifications and rental paperwork, he visually scanned the van and noticed an air freshener in the back of the van, as well as various garbage bags and clothes.

{¶ 5} Deputy Lewis then verified that the van was rented and discovered that Thomas had picked it up from Logan International Airport in Boston, Massachusetts at approximately 8:00 pm the previous night. Deputy Lewis asked Thomas to step out of the van, and began a

---

1 This court affirmed Graham's convictions and sentence in *State v. Graham*, 12th Dist. Warren No. CA2008-07-095, 2009-Ohio-2814, jurisdiction declined, 123 Ohio St.3d 1494, 2009-Ohio-6015, writ of habeas corpus denied with prejudice, *Graham v. Warden of Chillicothe Correctional Institute*, W.D. Ohio No. 1:10-CV-616, 2011 WL 3941512 (Sept.7, 2011). As the essential facts remain the same regarding Deputy Lewis's stop, we incorporate many of the pertinent facts as set forth in *State v. Graham*.

conversation with him in front of his police cruiser. Thomas told Deputy Lewis that he and Graham had driven from Boston in order to visit friends in Cincinnati. However, Thomas would not give Deputy Lewis a specific address or location where he visited his friends, instead telling Deputy Lewis that he and Graham slept in the van and were traveling to Cleveland.

{¶ 6}   After hearing Thomas' version, Deputy Lewis went back to the van and asked Graham to explain why the two had come from Boston the night before. Graham told Deputy Lewis that the two had been to Cincinnati, but said that they were visiting family. However, Graham could not give a specific location or address that they had visited. Graham also told Deputy Lewis that they had gotten lost and had, at one point, ended up in Indianapolis.

{¶ 7}   Deputy Lewis called for backup assistance and ran Thomas' and Graham's information through police dispatch to confirm their identifications and that neither had any outstanding warrants. By the time the information was verified, a backup unit arrived on the scene and Deputy Lewis felt the situation was secure enough to perform a canine sniff to detect drugs. During the search, Thomas and Graham were seated in the backup unit's cruiser. Before placing them in the cruiser, the backup officer patted Thomas and Graham down and found a McDonald's bag with over $2,000 cash in the back of Thomas' waistband. At that point, Deputy Lewis walked his canine partner around the van, and the dog alerted at the back of the van as well as the driver-side door.

{¶ 8}   Deputy Lewis opened the back door of the van, removed a blanket from the back seat area and found four individual bails wrapped in moving blankets and tape. After Deputy Lewis removed the moving blanket and cut through the tape and cellophane, he saw that the bundle was filled with a green, leafy substance he recognized as marijuana. The police then took the van to a secure garage and thoroughly searched the van, finding two more bundles of marijuana in the middle portion of the van. In total, 313 pounds of marijuana

were discovered in the van.

{¶ 9}   Soon thereafter, Detective Dan Schweitzer of the Warren County Drug Task Force and Special Agent Raymond Dratt of the Drug Enforcement Agency ("DEA") interviewed Thomas and Graham.  In an interview separate from Thomas, Graham told Schweitzer and Dratt that he and Thomas drove from Boston to Cincinnati, slept in the van at a rest stop, and had eventually stopped at a Dunkin' Donuts in the Kenwood Mall area.

{¶ 10} Graham said that while at Dunkin' Donuts, Thomas went outside and approached three unknown males and had a conversation with them.  The men drove off in the van and brought it back a few hours later.  Graham told Detective Schweitzer and Special Agent Dratt that Thomas said the men were family members.  When the van reappeared, Graham said that he and Thomas immediately started northbound towards Boston.

{¶ 11} Soon thereafter, Graham and Thomas were indicted and moved the court to suppress the marijuana and evidence seized from the van.  After a hearing on the matter, the court denied the motion to suppress.  Thomas then fled the jurisdiction and the trial court issued a capias for his arrest.  Thomas was later apprehended on federal drug charges, and sentenced to 37 months in federal prison.  Thomas was incarcerated in the Mashannon Valley Correctional Center, which is located in Pennsylvania.  Ohio filed a detainer against Thomas on June 7, 2010, and a magistrate in Pennsylvania state court held hearings on the extradition issue.  In the Pennsylvania court, Thomas refused to waive extradition, and the matter was continued for further proceedings.

{¶ 12} Thomas was set to be released from federal custody on April 23, 2012, and Ohio filed a request for temporary custody of Thomas.  On March 28, 2012, the Pennsylvania court held an extradition hearing, and then held another on April 5, 2012.  Ohio took custody of Thomas on April 18, 2012 and he was transported back to Warren County to face drug charges.

{¶ 13} Thomas moved to dismiss the charges against him, claiming Ohio violated the Interstate Agreement on Detainers by transporting and holding him in custody. The trial court denied the motion to dismiss, and the matter proceeded to a jury trial. The jury found Thomas guilty of possession of and trafficking marijuana, and the trial court sentenced Thomas to six years in prison. Thomas now appeals his conviction and sentence, raising the following assignments of error.

{¶ 14} Assignment of Error No. 1:

{¶ 15} THE TRIAL COURT ERRED WHEN IT FOUND THAT LAW ENFORCEMENT HAD THE REQUISITE PROBABLE CAUSE TO LAWFULLY STOP THE VEHCILE IN WHICH MR. THOMAS WAS AN OCCUPANT AND WHEN IT FOUND THAT LAW ENFORCEMENT HAD REASONABLE ARTICULABLE SUSPICION TO DETAIN MR. THOMAS AND SEARCH THE VEHICLE.

{¶ 16} Thomas argues in his first assignment of error that the trial court erred in denying his motion to suppress.

{¶ 17} As previously mentioned, this court has already considered the appeal of Thomas' co-defendant, Anthony Graham. In Graham's appeal, he also challenged the constitutionality of the stop. In affirming the trial court's denial of the motion to suppress, we found that the stop was valid at both its inception, as well as it duration. The same reasoning applies to the case sub judice.

{¶ 18} Appellate review of a ruling on a motion to suppress presents a mixed question of law and fact. *State v. Cochran,* 12th Dist. Preble No. CA2006-10-023, 2007-Ohio-3353. Acting as the trier of fact, the trial court is in the best position to resolve factual questions and evaluate witness credibility. *Id.* Therefore, when reviewing the denial of a motion to suppress, a reviewing court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Oatis,* 12th Dist. Butler No. CA2005-03-

074, 2005-Ohio-6038. "An appellate court, however, independently reviews the trial court's legal conclusions based on those facts and determines, without deference to the trial court's decision, whether as a matter of law, the facts satisfy the appropriate legal standard." *Cochran* at ¶ 12.

{¶ 19} The Fourth Amendment to the United States Constitution protects individuals from unreasonable governmental searches and seizures. *United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675 (1985). "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652 (1984). Specific to the legality of the initial traffic stop, "where a police officer stops a vehicle based on probable cause that a traffic violation has occurred or was occurring, the stop is not unreasonable under the Fourth Amendment to the United States Constitution * * *." *Dayton v. Erickson,* 76 Ohio St.3d 3 (1996), syllabus. "[E]vidence of a defendant's marked lane violation establishes reasonable suspicion or probable cause for a traffic stop." *State v. McEldowney,* 2d Dist. Clark No. 06-CA-138, 2007-Ohio-6690, ¶ 38.

{¶ 20} R.C. 4511.33(A)(1) requires that a vehicle "shall be driven, as nearly as is practicable, entirely within a single lane or line of traffic and shall not be moved from such lane or line until the driver has first ascertained that such movement can be made with safety." In the trial court's entry denying Thomas' motion to suppress, the court found that Deputy Lewis observed the van slow down quickly, which almost caused a rear-end collision with a semi-truck traveling behind it. Deputy Lewis began following, and observed the van drifting over the marked center-line and then back into the original travel lane. Based on Deputy Lewis' testimony, the court properly found that the evidence supported Deputy Lewis' conclusion that Graham committed a marked lane violation.

{¶ 21} As Graham's unsafe driving constituted a violation of R.C. 4511.33, Deputy Lewis had the requisite suspicion or probable cause to initiate the traffic stop. *See State v.*

*Gibson-Sweeney,* 11th Dist. Lake No. 2005-L-086, 2006-Ohio-1691 (reversing grant of motion to suppress where officer initiated a traffic stop after appellee's vehicle drifted over marked lanes by a distance of about two or three inches before crossing back into the original travel lane). Having found that the initial traffic stop was lawful, we will next analyze whether the stop became unconstitutional based on its duration.

{¶ 22} Thomas argues that even if the stop was lawful at its inception, it became a violation of his constitutional rights based on the unreasonable duration between the time Deputy Lewis pulled over the van and when the canine sniff occurred. "To justify a particular intrusion, the officer must demonstrate 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *State v. Batchili,* 113 Ohio St.3d 403, 2007-Ohio-2204, ¶ 11, citing *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868 (1968). The court in *Batchili* clarified the reasonable and articulable suspicion analysis by stating that a court must consider the "collection of factors * * * which cumulatively provide[ ] a sufficient reason for additional detention for the purposes of a canine walk around." *Batchili* at ¶ 19.

{¶ 23} Here, the trial court found that Deputy Lewis had several reasons for his articulable suspicion. Deputy Lewis testified that after he made the traffic stop, Graham and Thomas told him that they rented the van in order to drive from Boston to Cincinnati. Graham and Thomas also told Deputy Lewis that they slept in the van the previous night but then offered Deputy Lewis conflicting stories when prompted to explain their reasoning for traveling so far in one day only to turn around and go back home. Deputy Lewis further testified that Graham and Thomas were "nervous" during his questioning, and that at some point, he noticed an air freshener hanging in the back of the van. While Deputy Lewis asked Graham and Thomas questions and observed their demeanor, he awaited a response from dispatch for his warrant check on Graham and Thomas, and after the check was completed,

- 7 -

Deputy Lewis commenced the canine walk around the van.

**{¶ 24}** Based on this collection of factors, Deputy Lewis provided sufficient reason for detaining Thomas so that he could perform the canine walk-around. The record indicates that the stop took approximately 24 minutes before Deputy Lewis deployed his canine. This amount of time is not unreasonable given the circumstances of this case. Moreover, this court has previously held that detentions of approximately 24 minutes and 23 minutes were not unreasonable given the circumstances. *See State v. Howard,* 12th Dist. Preble Nos. CA2006-02-002, CA2006-02-003, 2006-Ohio-5656; and *State v. Bolden,* 12th Dist. Preble App. No. CA2003-03-007, 2004-Ohio-184. Here, Deputy Lewis diligently questioned Graham and Thomas, requested a warrant/records check, and worked to complete his traffic stop, and did not unreasonably detain Thomas beyond the time necessary to conduct the investigation.

**{¶ 25}** Thomas argues that this court's decision in *Graham* cannot control his case because since we decided *Graham*, the Sixth Circuit decided *United States v. Johnson*, 6th Cir. No. 11-5131, 2012 WL 1994765 (June 5, 2012). In *Johnson*, the Sixth Circuit overturned a decision of the district court to deny Johnson's motion to suppress. Johnson was pulled over by a Tennessee police officer for speeding. Johnson agreed to give Johnson a warning citation, and *after the warning was issued*, engaged in discussions with Johnson because the officer had become suspicious of criminal activity. Nineteen minutes *after the citation* was issued, a canine unit arrived and alerted. A marijuana "blunt" and a gun were found inside, and Johnson was indicted for "being a felon in possession of a firearm."

**{¶ 26}** The Sixth Circuit determined that the officer lacked reasonable suspicion to detain Johnson until the canine unit arrived because such suspicion was limited to Johnson being nervous, not having sufficient luggage in the car, a questionable travel itinerary, and the existence of a heavy duty cleaner in car. Thomas argues that the facts are the same in

his case and that Deputy Lewis lacked suspicion because he too thought that Thomas was acting nervous, had a questionable travel itinerary, and observed an air freshener in the car. However, the facts of Johnson are distinguishable from the case at bar because the officer in *Johnson* had already issued the traffic citation and then detained Johnson an extra and additional 19 minutes before the K-9 unit arrived. Here, however, the traffic stop never ended. Deputy Lewis was in the process of investigating the traffic violation when the K-9 performed the walk-around and the circumstances of the case were such that Deputy Lewis had articulable suspicion to permit the continuance of the traffic stop long enough for the K-9 unit to inquire.

**{¶ 27}** Deputy Lewis had other reasons that supported an articulable suspicion that were not included in *Johnson*. For example, Thomas and Graham gave conflicting stories to Deputy Lewis regarding the reason for their travel. Also, both admitted that they had been in Boston the night before, had come to Cincinnati, and were already on their way home. While *Johnson* spoke of a questionable travel itinerary not being sufficient basis for articulable suspicion, the officer in *Johnson* stated that the appellant's travel itinerary was questionable because Johnson stated he was on his way to meet someone he had met online, and yet did not bring adequate clothing for a possible stay. However, and unlike *Johnson*, Deputy Lewis was faced with two conflicting stories as to why Thomas and Graham were traveling, neither was able or willing to supply the location they specifically visited in Cincinnati, and no explanation was given for such a short turn-around-time.

**{¶ 28}** Also, Deputy Lewis was an experienced law enforcement officer and member of a drug task force, and was therefore able to state that air fresheners are often used to mask the odor of marijuana when such air fresheners appear in the back of a car rather than in the front where a driver would traditionally place them. Conversely, the Sixth Circuit noted that one could possess cleaner in their vehicle for a myriad of reasons. Another suspicion, and

the one that initially alerted Deputy Lewis, was that the van slowed down when it passed him even though it was properly driving within the speed limit. In *Johnson*, however the appellant was traveling 72 m.p.h. in a 55 m.p.h. zone. As an experienced drug task force agent, Deputy Lewis became suspicious of criminal activity when the van slowed down upon passing him even though it had not yet committed a traffic violation. In *Johnson*, the only reason the officer initiated the stop was because of the excessive speed at which the appellant traveled. Based on the distinguishable facts, we find that *Johnson* is not applicable to this case and does not change the reasoning we first set forth in *Graham* that the initial stop and duration of the stop were constitutionally sound.

{¶ 29} After reviewing the record, the trial court properly determined that Deputy Lewis had articulable suspicion to continue the stop. Accordingly, the trial court properly denied Thomas' motion to suppress, and his first assignment of error is overruled.

{¶ 30} Assignment of Error No. 2:

{¶ 31} THE TRIAL COURT ERRED TO THE PREJUDICE OF MR. THOMAS BY FAILING TO GRANT HIS MOTION TO DISMISS FOR VIOLATION OF THE INTERSTATE AGREEMENT ON DETAINERS ("IAD").

{¶ 32} Thomas argues in his second assignment of error that the trial court improperly denied his motion to dismiss because Ohio violated the Interstate Agreement on Detainers (IAD).

{¶ 33} "The Interstate Agreement on Detainers * * * creates uniform procedures for lodging and executing a detainer, *i.e.,* a legal order that requires a State to hold a currently imprisoned individual when he has finished serving his sentence so that he may be tried by a different State for a different crime." *Alabama v. Bozeman*, 533 U.S. 146, 121 S.Ct. 2079 (2001), syllabus. Ohio is one of 48 states that is a signatory to the IAD, along with the United States and the District of Columbia. *New York v. Hill*, 528 U.S. 110, 111, 120 S.Ct. 659

(2000). Ohio's involvement in the IAD is codified at R.C. 2963.30.

**{¶ 34}** Thomas argues that his indictment should have been dismissed according to R.C. 2963.30, Art. IV(e), which essentially protects the prisoner from excessive transfers through the so-called "anti-shuttling" provision.

> If trial is not had on any indictment, information or complaint contemplated hereby prior to the prisoner's being returned to the original place of imprisonment pursuant to Article V (e) hereof, such indictment, information or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.

The Supreme Court in *Bozeman* referenced the language found in Art. IV and noted that, "it is important to keep in mind that the [IAD] basically (1) gives a prisoner the right to demand a trial within 180 days; and (2) gives a State the right to obtain a prisoner for purposes of trial, in which case the State (a) must try the prisoner within 120 days of his arrival, and (b) *must not return the prisoner to his 'original place of imprisonment' prior to that trial*." 533 U.S. at 151. (Emphasis added.) Stated another way,

> Accordingly, by its express terms, the IAD is violated under two conditions—when a prisoner, who is serving a sentence in the sending state and indicted by the receiving state, is (1) transferred to the receiving state based on its lodging a detainer against him and requesting custody, *id.* at Art. IV(a), and then (2) returned to the "original place of imprisonment" before standing trial on the untried indictment, *id.* at Art IV(e).

*United States v. Pursley,* 474 F.3d 757, 762 (10th Cir.2007).

**{¶ 35}** Here, the facts are undisputed that the United States was the "sending state" and that Ohio was the "receiving state." Thomas was a federal prisoner when the detainer was lodged against him by Ohio. However, Thomas remained in federal custody during the time he appeared in the Pennsylvania court for preliminary matters, and was never "received" by Ohio during this time. Once Thomas arrived in Ohio and was in custody, the anti-shuttling provision of the IAD was triggered. However, there was no violation of the IAD because

Thomas' trial was properly held without Thomas ever being returned to federal prison or to any other state. Therefore, there was no violation of the IAD, and Thomas' second assignment of error is overruled.

{¶ 36} Judgment affirmed.

S. POWELL, P.J., and M. POWELL, J., concur.