[Cite as *State v. Harwell*, 2014-Ohio-4176.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NO. CA2013-11-104 |
| | : | O P I N I O N |
| - vs - | | 9/22/2014 |
| | : | |
| EDWARD HARWELL, | : | |
| Defendant-Appellant. | : | |

CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 12CR28482

David P. Fornshell, Warren County Prosecuting Attorney, Michael Greer, 500 Justice Drive, Lebanon, Ohio 45036, for plaintiff-appellee

Stephan D. Madden, 810 Sycamore Street, Fifth Floor, Cincinnati, Ohio 45202, for defendant-appellant

**HENDRICKSON, P.J.**

{¶ 1} Defendant-appellant, Edward Harwell, appeals from his convictions for trafficking in cocaine and possession of cocaine following his plea of no contest in the Warren County Court of Common Pleas. Harwell argues the trial court erred in overruling his motion to suppress evidence obtained from an illegal search and seizure. For the reasons set forth below, we overrule Harwell's arguments and affirm his convictions.

{¶ 2} Around 9:50 p.m. on July 18, 2012, Lieutenant Matt Hamilton and two fellow Ohio State Highway Patrol troopers were transporting suspects along Kings Mill Road near Interstate 71 (I-71) in Warren County, Ohio, when the troopers pulled their three marked cruisers into a gas station to get gas. Hamilton pulled his cruiser up to a gas pump behind a white Buick Rendezvous SUV (SUV) with New York license plates. When Hamilton pulled up, he saw a man, who was later identified as Harwell, standing beside the SUV's driver's side door with a "shocked" look on his face. As Hamilton pumped his gas and talked with his fellow troopers, he noticed a second man, later identified as Darryl Watkins, climb into the SUV's passenger seat. Hamilton finished fueling his vehicle and was preparing to leave the gas station when a disheveled and foul smelling Harwell approached him and expressed an interest in becoming a state trooper. Harwell told Hamilton he was getting a degree in criminal justice and asked if the Highway Patrol was hiring.

{¶ 3} As he had done in the past for individuals who had expressed an interest in becoming a state trooper, Hamilton informed Harwell of the requirements for becoming a trooper and described the application process. Hamilton stated the Highway Patrol was understaffed and looking for additional people. Hamilton asked Harwell if he wanted to provide his identification so that the Highway Patrol could add Harwell to its list of potential applicants who would later be contacted by a recruiter, which was the customary way in which applicants were contacted for employment opportunities. Harwell voluntarily handed over his license and Hamilton gave the information to his post's dispatcher. In the process of relaying the information to the dispatcher, Hamilton noticed that Harwell had a New York driver's license. Hamilton asked Harwell what he was doing in Ohio, and Harwell responded that he was in the area helping out his uncle who owned a trucking company and had recently had a stroke. Harwell got increasingly nervous as he talked with Hamilton and was unable to tell Hamilton the name of his uncle's trucking company or where the company was

located.

{¶ 4}   While Hamilton was talking with Harwell, dispatch, on its own initiative and without a request from Hamilton, ran Harwell's driver's license and found that Harwell's license had been revoked.  This information was conveyed to Hamilton.  When Hamilton asked Harwell about his license, Harwell indicated that his license "should have been taken care of" and that he had driving privileges from New York.

{¶ 5}   Because Hamilton had first observed Watkins enter the passenger side of the SUV, he believed Harwell had been driving the vehicle.  Hamilton noticed that during his conversation with Harwell, Watkins had moved over into the driver's seat.  Hamilton wanted to make sure that Watkins had a valid driver's license before the SUV pulled away from the gas station, so he approached the SUV to talk to Watkins.  Hamilton asked Watkins for his license and asked what had brought Watkins to Ohio.  Watkins told Hamilton that he and Harwell were just driving through Ohio on their way back from Atlanta, Georgia, where they had just dropped off his grandfather.  As Watkins' story did not match Harwell's story, Hamilton became suspicious and he started to pay closer attention to the interior of the SUV. Hamilton noticed that the SUV did not contain any luggage, there were a number of air fresheners scattered about the vehicle, the dashboard had tape-mark residue on it near the steering wheel, and the vehicle was littered with several fast-food bags.

{¶ 6}   After hearing Watkins' and Harwell's conflicting stories, being informed of the route they were traveling, observing the tape marks on the dashboard, seeing the air fresheners in the SUV, and noticing the absence of luggage, Hamilton became suspicious that Watkins and Harwell were engaged in criminal activity.  Specifically, Hamilton suspected Harwell and Watkins were involved in the trafficking of narcotics as the two men were traveling along I-71, a known corridor for the shipment of contraband from the south to the east coast.  As a result of his suspicions, Hamilton asked Watkins to exit the SUV and to

stand with another trooper.

{¶ 7} Hamilton reapproached Harwell, read him his *Miranda* rights, and began questioning Harwell about the conflicting story he had received from Watkins. Harwell attempted to change his story so that it would match Watkins' version. Harwell then acknowledged he had provided a conflicting story and stated he "should probably just stop talking."

{¶ 8} Thereafter, at 9:59 p.m., Hamilton contacted his post's dispatch and requested a canine unit. At 10:06 p.m., Hamilton was informed there were no Highway Patrol canine units on duty and the Warren County Sheriff's Office did not have a canine unit available. Hamilton was not satisfied with simply releasing Watkins and Harwell, so he requested that his dispatch try to find another canine unit or call one of the Highway Patrol's canine units on to duty. Dispatch responded that the West Chester Police Department had a canine unit available, and as of 10:17, p.m., Officer Scott Lovett and his canine partner, Rex, were in route to the scene. While waiting for Lovett to arrive, Hamilton had his dispatch run a criminal history on Watkins. Dispatch reported that Watkins had a lengthy criminal history, including convictions for possessing and trafficking in drugs.

{¶ 9} Lovett arrived at the gas station at 10:37 p.m. He conducted an open air sniff of the SUV with Rex, a German Shepherd trained to recognize narcotics such as cocaine, heroin, methamphetamine, and marijuana. Rex was walked around the SUV twice, and both times Rex alerted on the driver's side door seam and on the passenger's side door seam and door handle. Once Rex alerted, the troopers conducted a search of the vehicle and found 85 grams of cocaine inside a natural cavity behind the vehicle's interior molding in the rear cargo area.

{¶ 10} Following the troopers discovery of the cocaine, Watkins and Harwell were arrested. Harwell was indicted on one count of possession of cocaine in violation of R.C.

2925.11(A) and one count of trafficking in cocaine in violation of R.C. 2925.03(A)(2), both felonies of the first degree as the amount of cocaine involved equaled or exceeded 27 grams but was less than 100 grams. On September 20, 2012, Harwell filed a motion to suppress evidence relating to his arrest on the grounds that such evidence was seized in violation of his constitutional rights. Specifically, Harwell contended that he was detained without reasonable articulable suspicion of criminal wrongdoing and the detainment lasted an extraordinary and unreasonably long period of time. A hearing on Harwell's motion to suppress was held on October 5, 2012 and November 1, 2012. At this time the state introduced evidence and testimony from Hamilton and Lovett. Harwell did not call any witnesses.

{¶ 11} On November 5, 2012, the trial court issued a decision denying Harwell's motion to suppress. The trial court found that Harwell's initial interaction with Hamilton was consensual and was brought about by Harwell's act of approaching Hamilton to discuss employment as a state trooper. During the course of Hamilton's consensual encounters with Harwell and Watkins, Hamilton was given conflicting information regarding the men's presence in Ohio. The court determined that these conflicting stories, Hamilton's training and experience that I-71 is frequently used to transport illegal contraband, and his observations of the "appearance of the * * * vehicle, including food wrappers in the car, out of state license plates, the disheveled appearance of [Harwell and Watkins], * * * tape on the dash and interior, multiple air fresheners throughout the vehicle, and no indication of luggage," were specific and articulable facts leading to Hamilton's reasonable suspicion of criminal wrongdoing. The court held that Hamilton was justified in detaining Harwell and that the "length of the detention was not unreasonable under the circumstances" as Hamilton "acted deliberately and did not unduly delay" in seeking a canine unit to conduct an open air sniff of the SUV. The court then concluded that once the narcotics detection dog alerted on the

SUV, the officers had probable cause to search the vehicle.

{¶ 12} After the trial court denied his motion to suppress, Harwell entered a plea of no contest to the charges of possessing and trafficking in cocaine. Harwell was sentenced to three years in prison.

{¶ 13} Harwell timely appealed his conviction, raising the following assignment of error:

{¶ 14} THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT HELD THAT THE CONTINUED DETENTION OF APPELLANT WAS NOT UNREASONABLE.

{¶ 15} In his sole assignment of error, Harwell contends the trial court erred in denying his motion to suppress since the evidence presented at the motion-to-suppress hearing demonstrated he was detained on the basis of a "hunch" rather than on reasonable articulable suspicion that he was engaged in criminal activity. Harwell further contends that the "drug dog hit was invalidly obtained" as it occurred after an "unreasonable continued detention."

{¶ 16} Appellate review of a trial court's denial of a motion to suppress presents a mixed question of law and fact. *State v. Cochran*, 12th Dist. Preble No. CA2006-10-023, 2007-Ohio-3353, ¶ 12. Acting as the trier of fact, the trial court is in the best position to resolve factual questions and evaluate witness credibility. *Id.* Therefore, when reviewing the denial of a motion to suppress, a reviewing court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Oatis*, 12th Dist. Butler No. CA2005-03-074, 2005-Ohio-6038, ¶ 10. "An appellate court, however, independently reviews the trial court's legal conclusions based on those facts and determines, without deference to the trial court's decision, whether as a matter of law, the facts satisfy the appropriate legal standard." *Cochran* at ¶ 12.

{¶ 17} The Fourth Amendment to the United States Constitution and Section 14,

Article I of the Ohio Constitution protect individuals from unreasonable governmental searches and seizures. *State v. Casey*, 12th Dist. Warren No. CA2013-10-090, 2014-Ohio-2586, ¶ 18; *State v. Thomas*, 12th Dist. Warren No. CA2012-10-096, 2013-Ohio-3411, ¶ 19. "Generally, a 'seizure' occurs when a police officer, by means of physical force or show of authority, has restrained an individual's liberty in some way." *State v. Smith*, 12th Dist. Warren No. CA89-10-055, 1990 WL 116971, *1 (Aug. 13, 1990), citing *Terry v. Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868 (1968). "[O]fficers may briefly stop and detain an individual, without an arrest warrant and without probable cause, in order to investigate a reasonable articulable suspicion of criminal activity." *State v. Potter*, 12th Dist. Butler No. CA2006-07-166, 2007-Ohio-4216, ¶ 12, citing *Terry* at 19-21. "To justify a particular intrusion, the officer must demonstrate 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *State v. Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, ¶ 11, quoting *Terry* at 21. Accordingly, "[t]he propriety of an investigative stop by a police officer must be viewed in light of the totality of the surrounding circumstances" as "viewed through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *State v. LeClair*, 12th Dist. Clinton No. CA2005-11-027, 2006-Ohio-4958, ¶ 9, citing *State v. Freeman*, 64 Ohio St.2d 291 (1980), paragraph one of the syllabus.

{¶ 18} Not every contact between a law enforcement officer and a citizen, however, implicates the Fourth Amendment. *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382 (1991); *State v. Simmons*, 12th Dist. No. CA2012-11-229, 2013-Ohio-5088, ¶ 14. "An encounter which does not involve physical force or a show of authority is a consensual encounter that does not trigger Fourth Amendment scrutiny; therefore, an officer does not need reasonable suspicion merely to approach an individual in order to make reasonable inquires of him." *Potter*, 2007-Ohio-4216 at ¶ 13, citing *Hamilton v. Stewart*, 12th Dist. Butler

No. CA2000-07-148, 2001 WL 208838, *2 (Mar. 5, 2001). "'Encounters are consensual where the police merely approach a person in a public place, engage the person in conversation, request information, and the person is free not to answer and walk away.'" *Potter* at ¶ 13, quoting *State v. Taylor*, 106 Ohio App.3d 741, 747 (2d Dist.1995).

{¶ 19} In the present case, Harwell's initial interaction with Hamilton resulted from a consensual encounter that occurred only after Harwell voluntarily approached Hamilton to express an interest in becoming a state trooper. Harwell then proceeded to voluntarily provide his name and state identification so that he could be added to a list of potential job applicants. During this process Hamilton asked Harwell what he was doing "down this way" and his reason for being in Ohio. Hamilton's inquiry into Harwell's travel did not change the encounter from a consensual one into an investigative stop as it was reasonable for Hamilton to inquire what Harwell, a New York resident, was doing in Ohio. *See Simmons*, 2013-Ohio-5088 at ¶ 15; *Potter* at ¶ 13. There is no indication that Hamilton used force, exercised his authority as a police officer, or impeded Harwell's travel while asking about Harwell's presence in Ohio.

{¶ 20} The encounter between Harwell and Hamilton remained consensual even after Hamilton was advised by dispatch that Harwell's driver license had been revoked. The fact that dispatch, on its own initiative and without a request from Hamilton, chose to run Harwell's license did not change the encounter into an investigative stop. Furthermore, the fact that Hamilton approached Watkins, asked to see his license, and asked him what brought him to Ohio did not change the encounter into an investigatory stop. The encounter was consensual as Hamilton merely approached Watkins in a public place, engaged him in conversation, requested information, and Watkins was free not to answer and walk away. *See Potter* at ¶ 13.

{¶ 21} It was during his consensual encounter with Watkins that Hamilton began to

suspect criminal activity. The two men had provided inconsistent statements about their reasons for traveling in Ohio, thereby raising Hamilton's suspicions. Hamilton observed that the SUV did not contain any luggage, had tape-mark residue on the dashboard, had numerous air fresheners throughout its interior, and was littered with several fast-food bags. Furthermore, the route the two men were traveling, from the south back to the east coast, also raised Hamilton's suspicions as Hamilton knew from his prior experiences and training that I-71 was a major drug corridor often used to transfer contraband from the south to the east. These facts and observations, taken together with rational inferences from such facts, warranted detainment of Harwell and the SUV for further investigation. *See Batchili*, 2007-Ohio-2204 at ¶ 11; *State v. Kilgore,* 12th Dist. Butler No. CA98-09-201, 1999 WL 452235, *3 (June 28, 1999).

{¶ 22} We further find that the length of the detainment was reasonable under the circumstances. As we have previously held, in determining whether a detention is too long in duration to be justified as an investigative stop, a court must consider "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *State v. Howard*, 12th Dist. Preble Nos. CA2006-02-002 and CA2006-02-003, 2006-Ohio-5656, ¶ 22, quoting *United States v. Sharpe*, 470 U.S. 675, 686, 105 S.Ct. 1568 (1985). "A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing." *Sharpe* at 686.

{¶ 23} Here, the record reflects that Harwell was detained for nearly 40 minutes while law enforcement awaited the arrival of the canine unit. Hamilton testified that he became concerned that Harwell was engaged in criminal activity within ten minutes of his arrival at the gas station, and by 9:59 p.m., he had contacted his dispatch to request a canine unit be sent

to the scene to conduct an exterior sniff of the SUV. At 10:06 p.m., Hamilton was advised there were no Highway Patrol or Warren County canine units available. Hamilton asked his dispatch to try to find another canine unit in the area, and was informed that the West Chester Police Department had a canine unit available. Lovett testified that by 10:10 p.m., he had been authorized by his superiors to respond to the scene. Lovett arrived at the scene at 10:37 p.m., and promptly conducted an open air sniff of the SUV with Rex. While the delay in the canine unit's arrival was considerable, it was reasonable under the circumstances as the record demonstrates that law enforcement acted diligently and deliberately in pursing their investigation and there was no indication that a canine unit could have arrived at the scene any earlier. *See State v. French*, 104 Ohio App.3d 740, 748 (12th Dist.1995).

{¶ 24} Finally, we find that once Rex alerted to the presence of narcotics on both the driver's side and passenger's side of the SUV, law enforcement had probable cause to search the vehicle for contraband. *Howard*, 2006-Ohio-5656 at ¶ 17.

{¶ 25} Based upon the foregoing, we find no error in the trial court's denial of Harwell's motion to suppress. Hamilton's initial encounter with Harwell was consensual and Harwell's subsequent detainment was supported by reasonable articulable suspicion of criminal activity. Moreover, the length of detainment was reasonable under the circumstances as law enforcement acted deliberately and diligently in obtaining a canine unit to conduct an open air sniff test of the SUV. Finally, the search of the vehicle and seizure of evidence was supported by probable cause once the narcotics dog alerted to the contraband. Harwell's sole assignment of error is, therefore, overruled.

{¶ 26} Judgment affirmed.

PIPER and M. POWELL, JJ., concur.