KAREN LeCRAFT HENDERSON, Circuit Judge,
dissenting:
Just 18 months ago, we reversed the district court for holding that it lacked jurisdiction to compel the Department of Health Human Services (HHS), via mandamus, to comply with statutory deadlines for resolving Medicare reimbursement appeals. Am. Hosp. Ass’n v. Burwell, 812 F.3d 183, 192 (D.C. Cir. 2016) (AHA I). Further, we indicated that mandamus would “likely” be “requirefd]” by the end of September 2017 unless HHS, with congressional assistance if necessary, made “meaningful progress” toward reducing a backlog of hundreds of thousands of appeals filed with the agency’s administrative law judges (ALJs). Id. at 193. Seeing no such progress, the district court on remand issued a mandamus order directing HHS to eliminate the backlog by December 31, 2020, and to meet reduction targets in the interim; Today my colleagues overturn the district court again, this time concluding that it abused its discretion in too readily imposing a schedule for statutory compliance.
Why the change of direction? It is not because the district court miscalculated the equities. Maj. Op. 162 (court “thoughtfully and scrupulously weighed the equities”). It is not because the court lacked a basis for issuing the writ. Maj. Op. 168 (court “could potentially reissue the mandamus order”). It is not even because HHS cannot lawfully comply with the court’s order; impossibility is HHS’s primary argument but my colleagues do not consider it. Maj. Op. 168 (reserving issue for district court). Instead they send the case back because of a perceived procedural error: “since [HHS] represented that lawful compliance with the mandamus order was impossible, it was an error of law, and therefore an abuse of discretion, to nonetheless order the [agency] to render that performance without first finding' that lawful compliance was indeed possible.” Maj. Op. 166 (emphasis altered). On both law and fact, I disagree.
A district court need not make a finding of possibility as a precondition to mandamus relief unless the agency makes a strong threshold showing of impossibility. HHS has not met its burden: lawful compliance with the mandamus order here, even if difficult, is not demonstrably impossible. The district court expressly found as much in rejecting HHS’s impossibility claim. And by necessary implication, it *171 found as much in its careful equities analysis. Remanding so that the court can incant magic words—“lawful compliance [is] indeed 'possible,” Maj. Op. 166 (emphasis in original)—will tell us only what we already know and almost certainly produce a third appeal. The process will waste time, punishing blameless Medicare providers who await billions of dollars of delayed payments essential to their operations.
I. BACKGROUND
The majority recounts much of the legal, factual and procedural background, Maj. Op. 161-65, but I offer some additional context.
A. The Backlog
Under Title XVIII of the Social Security Act—formally named the Health Insurance for the Aged Act, Pub. L. No. 89-97, 79 Stat. 286 (July 30, 1965), and better known as the Medicare Act (Act), 42 U.S.C. §§ 1395 et seq.—a healthcare provider (e.g., a hospital) that treats a Medicare patient may seek government reimbursement by filing a claim with an HHS contractor overseen by the agency’s Center for Medicare and Medicaid Services (CMS). 42 U.S.C. § 1395ff(a)(l)-(2); 42 C.F.R. § 405.904(a)(2). If the initial contractor denies reimbursement, the hospital can seek further review from other CMS contractors. 42 U.S.C. § 1395ff(a)(3), (c); 42 C.F.R. § 405.904(a)(2). At the end of the CMS process, a dissatisfied hospital may seek a de novo hearing before an ALJ in HHS’s Office of Medicare Hearings and Appeals (OMHA). 42 U.S.C. § 1395ff(d)(l); 42 C.F.R. § 405.904(a)(2).
Under the Act, the OMHA ALJ “shall”—not merely “ought” to, Maj. Op. 161-62, 169 (emphasis omitted)—“render a decision” within 90 days of the hospital’s request for a hearing. 42 U.S.C. § 1395ff(d)(l)(A). “The word ‘shall’ is ordinarily the language of command.” Alabama v. Bozeman, 533 U.S. 146, 153, 121 S.Ct. 2079, 150 L.Ed.2d 188 (2001) (some internal quotations omitted). And so it is here. Because the Act uses mandatory language and refers to the 90-day time limit as a “[d]eadline[ ],” 42 U.S.C. § 1395ff(d), the time limit is a “congressionally imposed mandate[ ]” that HHS “must obey,” AHA I, 812 F.3d at 193.
The point is obvious but critical. The deadline is not a guideline. HHS has been violating it every day for years on end in failing to timely decide administrative appeals. It now takes an OMHA ALJ an average of nearly three years—more than eleven times longer than permitted—to process a Medicare appeal. HHS, Office of Medicare Hearings and Appeals: Workload Information and Statistics—Average Processing Time by Fiscal Year (May 24, 2017), www.hhs.gov/about/agencies/omha/ about/current-workload/average-processing-time-by-fiscal-year/index.html. As a result, appeals are badly backlogged. At last count, more than 600,000 of them are pending ALJ review. Status Report, Dkt. No. 56, Ex. at 2 (June 5, 2017). HHS projects that the backlog will grow worse with time, snowballing to nearly one million appeals by the end of September 2021. Id. at 8. Absent drastic action, then, it will soon take an ALJ significantly longer than three years to resolve a Medicare appeal.
Granted, the ALJ delays and backlog are not a simple matter of agency lassitude. As the majority explains, Maj. Op. 162-63, the number of appeals has risen sharply since the 2011 fiscal year, largely because (1) much of the baby boom generation has reached age 65 and enrolled in Medicare, Joint Appendix (JA) 84, 91, and (2) the Congress authorized implementation of an allegedly cost-saving but time-consuming program under which Recovery Audit Contractors (RACs) identify and re *172 coup alleged overpayments of Medicare reimbursements, 42 U.S.C. § 1395ddd(h)(l). The government pays RACs “on a contingent basis for collecting overpayments.” Id. § 1395ddd(h)(l)(B)(i), A hospital can appeal a finding of overpayment through the .same process by which it appeals a denial of reimbursement. Not surprisingly, statistics show .that the contingent pay structure gives RACs strong incentive to find overpayments that do not exist. See, e.g., JA 47-48 (in first quarter of 2014, surveyed hospitals collectively reported 66 per cent success rate in appealing adverse RAC decisions). And the incentive to find overpayments has produced a counter-incentive to appeal.
B. The Plaintiffs
Even the most conservative statistics show that a considerable number of all appeals, not only appeals from adverse RAC decisions, are “[fjully” meritorious.[1] HHS, Office of Medicare Hearings and Appeals: Workload Information and Statistics—Decision Statistics (Jan. 27, 2017) (53 per cent of appeals in fiscal year 2012 resulted in fully favorable disposition; in fiscal 2013, number was 44 per cent; in fiscal 2014, 37 per cent; in fiscal 2015, 34 per cent; in fiscal 2016, 26 per cent; and so far in fiscal 2017, 25 per cent), www.hhs. gov/about/agencies/omha/about/current-workload/decision-statistics/index.html.
The upshot is that hospitals are forced to wait years to receive reimbursements to which the law entitles them now. And they are waiting for quite a lot of money. HHS acknowledges that “[t]he combined billed amounts of the outstanding claims total approximately $6,6 billion.” Br. of Appellant 2. Breaking that number down a bit, plaintiff American Hospital Association (AHA) in 2014 surveyed more than 1,000 of its approximately 5,000 member hospitals and learned that “[t]he value of appealed ... RAC-denied claims” for those hospitals alone exceeded $1.8 billion. JA 48. Considering the appellate success rate, especially in RAC.cases, I believe it is fair to say that on any given day the AHA hospitals. represented in this lawsuit are collectively out of pocket nearly a billion dollars of their own money.
The delays are causing real-world problems. For plaintiff Baxter Regional Medical Center in Arkansas, Medicare reimbursements represent about two-thirds of gross revenue. In 2014, with millions of dollars tied up in Medicare appeals delayed at the ALJ level, Baxter lacked the cash for essentials such as “[purchasing .., beds for its intensive care unit,” “[replacing a failing roof over its surgery department” and “[replacing its twenty-year-old catheterization laboratory,” JA 38. Plaintiffs Rutland Regional Medical Center- in Vermont and Covenant Health in Tennessee face similar, problems, • For them, Medicare reimbursements represent about half of gross revenue. Collectively, they too have millions of dollars tied up in appeals delayed at the ALJ level. Partly because of the delays, Rutland has had to eliminate 32 jobs and Covenant is contemplating whether to cut back patient services.
C. AHA I
Based on HHS’s serial statutory violar tions and with no end in sight, AHA, Baxter, Rutland and Covenant sought relief in district court under the Mandamus Act, 28 U.S.C. § 1361. The court dismissed the complaint for lack of mandamus jurisdic *173 tion. 76 F.Supp.3d 43, 56 (D.D.C. 2014). As noted, we reversed. AHA I, 812 F.3d at 189-94. My colleagues summarize the decision in AHA I, Maj. Op. 163-64, and they take pains not to disturb it, Maj. Op. 165 (“One three-judge panel ... does not have the authority to overrule another three-judge panel[.]” (quoting LaShawn A. v. Barry, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (en banc))). Without purporting to provide a full summary of my own, I recap three important points.
First, we held that the plaintiffs have a “right to demand ... compliance” with the Act’s “mandatory” “deadlines.” AHA I, 812 F.3d at 190, 192. We acknowledged HHS’s argument that it “lacks the resources to render decisions within the statutory time frames.” Id. at 191. But we observed that “however modest [an agency’s] personnel and budget resources may be, there is a limit to how long it may use these justifications to excuse inaction in the face of a statutory deadline.” Id. (internal quotation omitted).
Second, we pointed out that the Act gives HHS “substantial discretion” to limit the scope of the RAC program. AHA I, 812 F.3d at 193. Because “congressionally imposed mandates ... trump discretionary decisions,” we held that HHS “will have to curtail the RAC program or find some other way to meet” the 90-day ALJ-level deadline. Id.
Third, although recognizing the district court’s “broad discretion in weighing the equities,” we also suggested that “the unique circumstances of this case” and “the clarity of the statutory duty likely will require issuance of the writ” absent “meaningful progress” by “the close of the next full appropriations cycle”—i.e., by the end of September 2017. AHA I, 812 F.3d at 193,.
D. The Mandamus Order
We issued our mandate in April 2016. Mistaking defeat as victory, HHS sought an 18-month stay of the proceedings on remand so that it could “continue to make meaningful progress in resolving the OMHA backlog.” Defi’s Mot. for Stay, Dkt. No. 30 at 2 (May 25, 2016). Discerning no such progress, 209 F.Supp.3d 221, 227-30 (D.D.C. 2016), and carefully weighing the equities that would also guide its mandamus decision, id. at 225-26; see id. at 225 (noting that “stay and mandamus inquiries ... overlap[ ]”), the district court denied the stay motion, id. at 230. It was unmoved by the agency’s modest restructuring of RAC contracts, its tinkering with appeals procedures, its proposal' to “facilitate settlement conferences” and its recall of retired ALJs. Id. at 227-28, Even with those initiatives, the agency projects that its ALJ-level backlog will exceed 800,000 appeals by the end of fiscal year 2020. Status Report, Dkt. No. 56, Ex. at 3. Without the initiatives, the backlog would likely balloon to nearly two million appeals by the end of fiscal 2020. 209 F.Supp.3d at 228. Noting the statistics, the court reasoned that “significant progress toward a solution ... has to mean real movement toward statutory compliance,” not merely “that things get worse more slowly than they would otherwise.” Id. (internal quotation marks omitted). The court was especially “concern[ed]” about HHS’s RAC proposals, which are projected to “reduce the number of appeals ... by just 22,000” before fiscal year 2020. Id. at 228-29. The court also saw no legislative fix on the horizon. It emphasized that the Congress, although armed with “ample knowledge of the backlog,” has repeatedly failed to provide significant assistance through appropriations or other means. Id. at 230.
The plaintiffs moved for summary judgment and proposed specific methods for *174 eliminating the backlog. They suggested the district court compel HHS to offer broad-based settlement of pending claims, defer repayment of overpayments and penalize RACs for high reversal rates. Alternatively, they proposed that the court order a four-year timetable for eliminating the backlog. HHS opposed all of the plaintiffs’ suggestions. As relevant here, it argued that their proposed timetable “conflict[s] with the Medicare statute” by requiring the agency “to make payment on Medicare claims regardless of ... merit.” Def.’s Opp., Dkt. No. 41 at 23 (Nov. 7, 2016) (citing 42 U.S.C. §§ 1395g(a), 1395y(a)(l)(A)). HHS proposed no methods of its own that can eliminate the backlog absent legislative action. Nor did it offer an alternative timetable. Instead it touted the modest measures it is already taking and claimed that they will improve the situation “if Congress increases HHS’ authorities and funding.” Id. at 6.
In December 2016, the district court granted summary judgment to the plaintiffs, concluding that HHS did “not provide enough evidence of progress” to alter the court’s earlier calculation of the equities. 2016 WL 7076983, at *2 (D.D.C. 2016); see id. (“[HHS] does not point to any categorically new administrative actions and, critically, continues to promise the elimination of the backlog only ‘with legislative action’—a significant caveat.” (quoting Def.’s Opp. 6)). Recognizing that the plaintiffs “could have chosen to demand immediate relief,” the court commended them for instead “offering] a thoughtful and reasonable four-year plan for this complex problem.” Id. at *3. Also, it expressly rejected HHS’s argument that lawful compliance with the plaintiffs’ timetable is not possible. Id. It reasoned that the timetable “demands ... ‘proper claim substantiation’ within a reasonable timeframe” but does not require the agency to “ ‘make payment on Medicare claims regardless of ... merit.’ ” Id. (quoting Def.’s Opp. 22-23).
Accordingly, and in an attempt to “intrude as little as possible on [HHS’s] specific decisionmaking processes and operations,” the district court adopted the plaintiffs’ proposed timetable but did not dictate any particular method for eliminating the backlog. 2016 WL 7076983, at *3. The court mandated a 30 per cent reduction of the backlog by December 31, 2017; a 60 per cent reduction by December 31, 2018; a 90 per cent reduction by December 31, 2019; and 100 per cent elimination by December 31, 2020. Id. The court added that, “if [HHS] fails to meet the above deadlines, [plaintiffs may move for default judgment or to otherwise enforce the writ of mandamus.” Id. (citing Fed. R. Civ. P. 55(d)).
II. ANALYSIS
We review issuance of the writ of mandamus for abuse of discretion, AHA I, 812 F.3d at 190, which means “[w]e must give the benefit of every doubt to the judgment of the trial judge,” Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 438-39, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996) (internal quotation omitted). I see no abuse here, nor any legal error tantamount to one, contra Maj. Op. 165 (citing Koon v. United States, 518 U.S. 81, 100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996)).
A. The District Court Did Not Have To Make a Finding of Possibility.
My colleagues hold that the district court had to, and failed to, make a “finding” that HHS can lawfully comply with the mandamus order. Maj. Op. 165. Their primary authority appears to be NRDC v. Train, 510 F.2d 692 (D.C. Cir. 1974). But to the extent that Train applies, it supports the district court’s judgment. At most it requires a finding of possibility if *175 an agency makes a strong threshold showing of impossibility. HHS has not done that.
1. HHS’s burden
At issue in Train were statutory deadlines by which the Environmental Protection Agency (EPA) had to issue guidelines on “the quantity of pollutants that may be discharged into the nation’s waters.” 510 F.2d at 695. It had to issue guidelines for what we called “Group I” sources of pollutants by October 18, 1973. Id. at 704-05. It had to issue guidelines for certain “Group II” sources by December 31, 1974. Id. at 706-11. The first deadline came and went “without the publication of a single ... guideline.” Id. at 704. The National Resources Defense Council sued in an effort to compel the EPA to act. Id. at 695. In November 1973, the district court ordered the EPA “to comply with a detailed timetable for publication of guidelines” for both Group I and Group II sources “beginning on January 15, 1974, and ending on November 29,1974.” Id. at 697-98.
We vacated and remanded in part. Train, 510 F.2d at 705, 713-14. We first held that the district court “acted reasonably” as to Group I sources:
In light of the failure of the agency to meet its acknowledged duty [as to Group I sources], the District Court’s decision to incorporate a timetable into the order constituted a reasonable step to facilitate supervision of the decree and to ■assure early efforts by the delinquent defendant toward eventual discharge of its statutory responsibility. ... The authority to set enforceable deadlines both of an ultimate and an intermediate nature is an appropriate procedure for exercise of the court’s equity powers to vindicate the public interest.
Id. at 704-05 (footnotes omitted).
Turning to the December 1974 statutory deadline for certain Group II sources, we found—before the deadline had passed— “no present failure on the part of the [EPA] Administrator to meet his responsibility.” Train, 510 F.2d at 711. Seeing “no violation of a statutory duty,” we thought it appropriate “to give the Administrator latitude to exercise his discretion in shaping the implementation of the [statute],” id. at 711-12, and we vacated the district court’s timetable insofar as it required early issuance of guidelines for Group II sources, id. at 705, 714. We acknowledged the EPA’s “apprehension” that “manpower or methodological constraints” might prevent compliance as to Group II sources. Id. at 712-13. We instructed the district court that it could not “responsibly mandate flat ... deadlines” for those sources on remand if “the Administrator demonstrates that additional time is necessary.” Id. at 712 (emphasis added). Our reasoning was that a court’s equitable discretion does not include the authority to punish, through contempt, a party who has “demonstrated that he [is] powerless to comply” with a court order. Id. at 713 (emphasis added).
In the majority’s telling, because HHS “represented” that compliance is impossible, the district court had to make a finding of possibility before it could impose a timetable on the agency. Maj. Op. 165; see id. at 168 (district court must make finding of possibility when agency “insists” compliance is not lawfully possible). But nowhere in Train did we suggest that, before ordering phased fulfillment of a statutory obligation an agency is then violating, a court must make a finding of possibility if the agency merely asserts impossibility and makes no threshold “demonstration]” of it. 510 F.2d at 712-13.
Not only is the majority’s requirement a new one; it is contrary to sound practice. True, a district court should not hold agen *176 cy officials in contempt “for omitting an act [they are] powerless to perform.” Maggio v. Zeitz, 333 U.S. 56, 72, 68 S.Ct. 401, 92 L.Ed. 476 (1948); see Maj. Op. 168. But private parties have a “right to demand ... compliance” with a statute’s “mandatory” “deadlines.” AHA I, 812 F.3d at 190, 192. It follows that a court is ordinarily entitled to presume, absent a contrary showing, that the agency can comply. After all, the doctrine of administrative impossibility is a narrow one reserved for “extreme” circumstances. Train, 510 F.2d at 713. If the agency cannot at the threshold meet its “heavy burden to demonstrate .. impossibility,” Ala. Power Co. v. Costie, 636 F.2d 323, 359 (D.C. Cir. 1979), the court should be permitted to act immediately. 'Saddling it with a finding requirement—-which in some cases might also impose a hearing requirement, see Oral Arg. Recording 21:22-21:35—simply slows the process for issuing time-sensitive relief. In the meantime, faultless private parties bear the costs of the agency’s ongoing statutory violations.
2. HHS’s arguments
HHS has not made a sufficient threshold “demonstration]” of impossibility to trigger any finding on the matter. Train, 510 F.2d at 712-13. For starters, its burden is “especially heavy” because it seeks “prospective exemption” from a four-year timetable “based upon [its] prediction” of impossibility. Ala. Power, 636 F.2d at 359 (emphasis added). Its prediction rests on two premises: (1) it “has a statutory obligation to ensure that non-meritorious claims are not paid,” Br. of Appellant 20 (citing 42 U.S.C. § 1395y(a)); and (2) “curtailment of the RAC program cannot resolve the backlog,” id. at 18. The first point is true as far it goes and the second may prove true eventually. But HHS oversells the importance of both points.
First, although HHS is not authorized to reimburse providers for items and services that are not medically “reasonable and necessary,” 42 U.S.C. § 1395y(a)(l)(A)-(E), its own regulations permit it to settle claims that are less than certain to prove meritorious on a case-by-case basis. For example, CMS may “compromise” some kinds of claims, including ones relating to overpayment, based on “[l]itigative probabilities” and related considerations. 42 C.F.R. §§ 401.613(c)(2), 405.376(d), (h). HHS offers no good reason to reject the statutory interpretation embodied in the regulations. Nor does it cite any other relevant authority prohibiting it from adopting the plaintiffs’ 'primary proposal: offering systematic settlements based on the provider, the type of claim or both. The proposal is a sound one. It does not ask HHS to authorize payments without regard to merit. It asks HHS to evaluate merit “at a higher level of generality” based on statistical sampling. Br. of Appel-lees 23. In district court, HHS’s then-chief financial officer acknowledged that the agency can “resolve pending appeals at OMHA by applying an individualized payment percentage” based on the specific provider’s “historic success rate.” JA 152. Similarly, HHS acknowledges in this Court that it has “globally settled” claims before, dispatching some 380,000 of them based on type without case-by-case adjudication. Br. of Appellant 9.
HHS says the remaining claims in the backlog are not appropriate for “bulk settlements” because they do not appear “homogeneous” enough. Br, of Appellant 26. The agency needs to look more closely. HHS’s chief financial officer admitted that a single durable medical equipment supplier is responsible for “more than 24% of all pending appeals” at the.ALJ level. JA 138. Suppose, hypothetically, that the supplier’s historic success rate with the ALJs is 50 *177 per cent,[2] As far as I can tell, nothing but obstinance is stopping HHS from offering the supplier 50 cents on the dollar—or less, to account for the time, litigation expenses and uncertainty it spared the supplier—to resolve'the ■ supplier’s claims. Just that one approach to one repeat claimant has the potential to dispatch nearly a quarter of' the appeals from HHS’s backlog. If the agency were to take the same approach with other high-volume claimants based on each claimant’s historic success rate, the record manifests that it would put a tremendous dent in the backlog. See id. (noting that “top ten appellants” within backlog “comprise more than 40% of all pending appeals”).
'Granted, bulk settlement poses hazards. If HHS, under the thumb of a mandamus order, looks too willing to settle outside the parameters of case-by-case adjudication, it weakens its bargaining position; enables “hospitals with below-average success rates [to] accept at disproportionately high rates”; and may incidentally encourage the filing of baseless claims. Reply Br. of Appellant 9; see Status Report, Dkt, No. 55, Ex. at 4 (Mar. 5, 2017) (according to acting chief financial officer, some claimants are delaying settlement “in the anticipation that relief mandated by the [district court] will yield a higher payout”). Indeed, the percentage of fully successful ALJ appeals has declined in recent years, see HHS, Decision Statistics, supra pp. 4-5, which might indicate that some bad actors have injected dubious claims into the backlog in hopes of artificially favorable settlements imposed by the courts. .
' But bargaining power is a two-way street. Subjecting the average claimant to a waiting period more than eleven times longer than the statute permits—and thereby ..choking off. cash flow for basic operational needs—unfairly weakens the claimant’s position, giving it every incentive to settle for only a fraction of what it might win after-years of litigation. In other words, the backlog undermines both parties. Thus, if done right, a bulk settlement could well be negotiated in near equipoise. HHS has offered nothing better than rapk speculation for concluding otherwise. And the burden, remember, is on HHS.
In any event, the district court did not mandate settlement, let alone dictate particulars. HHS is therefore free to mitigate hazards based on its expertise and experience. One way to do so is to focus on high-volume claimants: as mentioned, just a handful account for hundreds of thousands of appeals in the backlog, JA 138, and each is presumably a sizable company with a long-term reputational stake and a predictive success rate rooted in a meaningful sample size. To further ensure a level playing field and to dissuade bad actors, the plaintiffs reasonably suggest that HHS “requir[e] a provider to settle all eligible appeals and ... exténd[ ] an offer only to those claims pending at a particular date,” Br. of Appellees 26. The agency has undertaken such measures before. CMS, Frequently Asked Questions—Hospital Appeals Settlement for Fee-for-Service Denials Based on Patient Status Reviews for Admissions Prior to October 1, 2013, at 3, https://gqo.gl/YH5cC6.
■ Second, although major RAC reform might not alone resolve the backlog, see Br. of Appellant 18, it will go further than HHS lets on. The program was mostly *178 dormant for the better part of two years from 2014 to 2016 while the agency negotiated new RAC contracts. See Maj. Op. 166 (citing, inter alia, U.S. Gov’t Accountability Office, GAO-16-366, Medicare Fee-for-SERVICE: OPPORTUNITIES REMAIN To IMPROVE Appeals Process 38- n.64 (2016) (GAO Report)). Citing statistics from the Ml, HHS misleadingly suggests that RAC appeals are no longer a major contributor to the backlog. See, e.g., Br. of Appellant 18 (“In 2016, ... RAC appeals comprised just 14.1% of new appeals to OMHA, and in 2016, this figure fell to 9.5% (fewer than 16,000 appeals).”). In 2016, however, HHS itself “reported that it expects the number of incoming appeals to increase again when new [RAC] contracts are awarded and the [RAC] program resumes full operation.” GAO Report 38.
As of April 2016, as many as 300,000 appeals from adverse RAC decisions were pending ALJ review. True, that number dipped to about 156,000 by the end of September 2016, before new RAC contracts took effect in October. But even that artificially low number represents a good chunk of the backlog, which supports the supposition—voiced in our earlier decision—that cutting back the discretionary RAC program will go some distance toward statutory compliance. AHA I, 812 F.3d at 185, 193. And if simple contractual reasons are enough justification to put the RAG program on hold, even more so is compliance with a statutory deadline. Id. at 193 (deadline “trump[s]” RAC program and “dictate[s] that [HHS] will have to curtail the RAC program or find some other” method of compliance).
Like the majority, Maj. Op. 166, I view HHS’s RAC-related efforts to date as “weak medicine for an agency facing mandamus.” Perhaps HHS should suspend the RAC program altogether until it eliminates the backlog. The district court properly left that decision to the agency. 2016 WL 7076983, at *3. It suffices to say that HHS’s ability to limit the program, see AHA I, 812 F.3d at 186, 193, combined with its ability to negotiate bulk settlements, see 42 C.F.R. §§ 401.613(c)(2), 405.376(d), (h), means the agency has not shown that it cannot lawfully comply with the court’s timetable.[3]
B. Even If The District Court Had To Make A Finding, It Did.
Assume arguendo the district court was required to make a finding of possibility. The point of such a requirement, I take it, is to ensure that the court does not punish agency officials with contempt until it satisfies itself that they can rightly be blamed *179 for failing to do something they are both obligated and able to do. Maj. Op. 167-68; see Maggio, 333 U.S. at 72, 68 S.Ct. 401; Train, 610 F.2d at 713. For two reasons, any worry about rashly punishing blameless officials is absent here.
First, and most importantly, the district court in fact made a finding of possibility. What else could it have meant in expressly rejecting HHS’s claim of impossibility? Specifically, the court rebuffed HHS’s contention that the timetable requires the agency to ‘“make payment on Medicare claims regardless of ... merit’ ” and therefore ‘“conflicts] with the Medicare statute.’ ” 2016 WL 7076983, at *3 (quoting Def.’s Opp. 22-23). Granted, other language in the order suggests that the court—apart from concluding that the timetable does not demand reimbursement regardless of merit—did “‘not dive into the parties’ debate’ over the ‘legality and propriety of the reforms necessary to comply with the timetable.” Maj. Op. 165 (quoting 2016 WL 7076983, at *3). But because we are to “give the benefit of every doubt to the judgment of the trial judge” in this realm of broad district court discretion, Gasperini, 618 U.S. at 438-39, 116 S.Ct. 2211 (internal quotation omitted); see AHA I, 812 F.3d at 193, I can only conclude that the court considered and rejected the agency’s impossibility claim, see Sprint/United Mgmt. Co. v. Mendelsohn, 552 U.S. 379, 386, 128 S.Ct. 1140, 170 L.Ed.2d 1 (2008) (on abuse-of-discretion review, “[a]n appellate court should not presume that a district court intended an incorrect legal result when the order is equally susceptible of a correct reading”).
Other aspects of the district court’s decision reinforce the point. My colleagues reaffirm that a district court “contemplating the equities” “may not require an agency,” on pain of contempt, “to render performance that is impossible.” Maj. Op. 167; see Train, 510 F.2d at 713 (it is “unjust” to do so). At the same time, they recognize that the district court here “thoughtfully and scrupulously weighed the equities” and only then “conclud[ed] that the scales tipped in favor of mandamus.” Maj. Op. 162. If impossibility goes to the equities and if a court carefully contemplates the equities before issuing the writ, we have no reason to assume it has erroneously required an impossibility. See Sprint/United Mgmt. Co., 552 U.S. at 386, 128 S.Ct. 1140. That goes double where, as here, the district court repeatedly characterizes its own demands as “reasonable.” 2016 WL 7076983, at *3 (expressing “appreciation]” for plaintiffs’ “thoughtful and reasonable four-year plan”); id. (noting timetable requires HHS “to undertake proper claim substantiation within a reasonable timeframe” (internal quotation omitted)).
Second, even if HHS violates the timetable, the order does not make contempt an automatic consequence. At that point, rather, the “[plaintiffs may move for default judgment or to otherwise enforce the writ of mandamus.” 2016 WL 7076983, at *3 (citing FED. R. CIV. P. 55(d)). The order thus includes a failsafe for revisiting impossibility as developments dictate. That is precisely how the writ is supposed to work: “The court’s injunction should serve like adrenalin, to heighten the response and to stimulate the fullest use of resources. This may run the risk of overstimulating the organism, but palliative measures may be taken ... if indicated at a later date.” Train, 510 F.2d at 712. Under the order here, if HHS were truly unable to comply despite deploying its “fullest ... resources”—which it has not yet done—the court in its discretion could undertake “palliative measures” well short of contempt. Id. Again, we have no reason to assume the court would abuse its discre *180 tion, To the contrary, its prudence, to date should give us the strongest confidence.
C. Even If the District Court Failed To Make A Required Finding, Vacatur And Remand Are Unwarranted.
In my estimation, even if the majority were right to find error, its remedy would nonetheless be wrong. Because we review a district court’s judgment, not its rationale, we can sometimes “sustain a ‘right-result, wrong-reason’ decision.” People’s Mojahedin Org. of Iran v. Dep’t of State, 182 F.3d 17, 23 n.7 (D.C. Cir. 1999). In some cases, for example, “[tjhere is ... no need for remand if an intelligent review of the record can be made.” Am. Emp’rs Ins. Co. v. Am. Sec. Bank, 747 F.2d 1493, 1498 (D.C. Cir. 1984). This case strikes me as just such a case.
My colleagues acknowledge that HHS will at some point have the “heavy burden” of proving impossibility. Maj, Op. 168 (quoting Ala. Power, 636 F.2d at 359). I see no reason to postpone the inevitable. For all the record-based reasons already discussed, we can say here and now that the agency has not met its burden. - We should do so. Much like the district court, we are to consider the equities, in arriving at our disposition. 28 U.S.C. § 2106- (appellate court may affirm or, inter alia, vacate and remand with an eye toward what is “just under the circumstances”). Today’s remand gets the equities backwards: it punishes providers with further delay and rewards an obdurate agency. It cannot' be the result-we had in mind when we suggested that “the clarity of the statutory duty .likely will require' issuance of the writ” absent “meaningful progress” the political branches still have not made. AHA I,812 F.3d at 193.
He Ht H* H« $
This case is not about' the difference between ought and cannot. It is about the difference between shall and will not. The district court correctly rejected the agency’s assertion of impossibility. Accordingly, I respectfully dissent.[4]

. If there is a “growing sense” among providers “that it is a good business practice to appeal every denied claim,” Maj. Op. 163 ' (quoting JA 92), it is probably because they often prevail.

. The chief financial officer’s declaration suggests the rate is higher, JA 138, but at oral argument HHS said the declaration is not "artfully phrased” in that regard, Oral Arg. Recording 12:45-13:41. The particular number is immaterial for my purpose; the agency can offer the supplier a settlement commensurate with the supplier’s historic success rate, whatever it is.

. I recognize that, if not for today's remand, the timetable's first deadline would be only a few months away. 2016 WL 7076983, at *3 (mandating 30 per cent reduction of backlog by December 31, 2017). Complying would no doubt be a heavy lift. But much of the difficulty in meeting the first deadline is HHS’s own doing. It offered the district court no alternative to the plaintiffs’ phased reduction targets. Nor does it offer us one: primarily it proposes •to give the district court status updates in which it will "attest to its ongoing attention to the backlog.” Br. of Appellant 30; see Oral Arg. Recording 12:15-12:19 ("[W]e certainly couldn't tie ourselves or commit to a specific date .... ”). And HHS has fought the mandamus order tooth and nail from the moment it issued in December 2016. Had the agency instead committed immediately to bulk settlements and major RAC reform, it would now be much closer to a 30 per cent reduction. The district court did not have to assume in December 2016 that the agency would use fewer than all viable methods. Because the agency did not make a threshold-showing of impossibility when the first deadline was still 13 months away, the court was not required to make an express finding of possibility. See Old Chief v. United States, 519 U.S. 172, 182 n.6, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997) ("It is important that a reviewing court evaluate the trial court’s decision from its perspective when it had to rule and not indulge in review by hindsight.”).

r In response, the majority repeats with string parentheticals that (1) the district court cannot, by mandamus, demand the- impossible, Maj, Op, 168; and (2) HHS asserted that compliance with the court’s timetable is impossible, Maj, Op. 169 n. 3. I do not dispute either component of that analysis. But an assertion is not a " demonstration].” Train, 510 F.2d at 712-13,- And by no means do I suggest that, if an agency in fact makes the requisite threshold showing, it is "hypertech-nical” to require a ruling on impossibility. Contra Maj. Op. 168. My point is that HHS did not make a threshold showing and, in any event, the court did rule on impossibility. The needless technicality here is requiring the court to be any more specific than it was.